[No. 10950–2–I.  Division One.  March 14, 1983.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH
A. FRIEDERICK, *Appellant.*

*Paris K. Kallas* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Deanna Fuller, Deputy,* for respondent.

RINGOLD, J.—The defendant, Joseph Arthur Friederick, appeals the judgment and sentence entered upon his conviction by a jury of one count of kidnapping in the first degree (RCW 9A.40.020) while armed with a deadly weapon (RCW 9.95.040) and one count of robbery in the first degree (RCW 9A.56.200) while armed with a deadly weapon (RCW 9.95.040). We find no error in the rulings of the judges who presided at the CrR 3.5 hearing and at trial, and the evidence was sufficient to support the robbery conviction. We therefore affirm.

On May 1, 1981, the victim, Ms. R., left work in downtown Seattle and headed for her car, which was parked in the Olympic Hotel garage. A man boarded the elevator with her and pushed the button for the top floor. When she left the elevator at the "J" level the man got out behind her, held a knife to her neck, and told her to keep quiet. He then pulled her into a stairwell at the end of the garage. She later testified that "he was indecisive in what he was going to do," and that she told him, "Here. I don't know what you want. I've got money. I will give you my money. I've got change. I will give you the change. I will give that even. Just let me go. I don't want anything to happen to me." He said, "Okay. Give me your money," and she complied. He then told her that they would go to her car and she would throw the keys underneath it to give him time to get away.

When they got to the car the man put on a pair of blue

ski gloves and told Ms. R. that the gloves were for his protection, to prevent fingerprints. He ordered her to take him to Northgate Mall and he would then let her go. She agreed, but jumped out of the car at the garage exit. Her assailant fled on foot. Ms. R. described him as tall, with blond hair, wearing blue jeans and tennis shoes.

On May 16, 1981, another woman, Ms. S., was raped at knifepoint in a stairwell on the 24th floor of the Park Hilton Hotel in downtown Seattle. She described the rapist as approximately 6 feet tall and strongly built, with blond hair, wearing blue ski gloves, blue tennis shoes, blue jeans, and a ski coat. This incident was reported to police and to Hilton Hotel security.

The next day Michael Cole, a Hilton Hotels security guard who had interviewed the rape victim on May 16, was on his rounds walking between the Park Hilton and the Seattle Hilton a block away. He noticed the defendant, Joseph Friederick, a tall blond man in blue tennis shoes who had what looked like bulky gloves tucked in under his shirt enter the Park Hilton. Cole followed Friederick into the lobby, where he noticed him "just looking around, but he also directed his attention towards two women in general. Watching women get on the elevators, not just, you know anyone." When a woman got on an elevator alone, Friederick "immediately got on the elevator with her." Cole got on as well, and saw that Friederick had pushed 24 while the woman had pushed 7. Cole pushed 26. Friederick got off at the 25th floor, but was gone by the time Cole walked down the stairs from 26. Cole returned to the lobby.

Approximately 10 minutes later Cole saw Friederick reenter the hotel lobby from the outside and begin watching the elevators again. When two women got on the elevator, Friederick got on with them and pushed 25. Cole got on another elevator and took it directly to 25, but Friederick never arrived. Upon returning to the lobby, Cole saw Friederick exit from an elevator and leave the hotel. Cole followed him.

Outside the hotel Cole met another security guard, Wil-

liam Jensen, and told him he was following a suspect in the May 16 rape. Friederick returned to the Park Hilton. The two guards followed him into the lobby and notified the Seattle Police. When Friederick left the hotel, Cole and Jensen followed.

On the street, the guards flagged down a passing Seattle Police cruiser and informed Officer Palacol of their suspicions and the reasons therefor. Palacol confronted Friederick at a bus stop, saying "Stop. I want to talk to you." Friederick ran, and Officer Palacol radioed to other police units, advising them he was on a chase. Officer Wabschall, who observed the suspect run away and drop something, intercepted the defendant two blocks away, drew his revolver, and ordered him to halt. Jensen and Officers Guillen and McMahon then arrived and Officer Guillen frisked Friederick. A pair of blue ski gloves fell on the ground from under Friederick's shirt. About a minute later, a pedestrian approached and gave the police officer a 4–inch paring knife which Friederick had dropped during the chase.

After being advised of his rights, Friederick admitted having sexual intercourse with a woman in a hotel stairwell the previous day, but he claimed the woman was a prostitute and the intercourse was consensual. He said he had worn ski gloves because he was cold. He was subsequently identified as the assailant in the May 1 incident by Ms. R. and two eyewitnesses.

Friederick was charged by second amended information with one count of first degree kidnapping while armed with a deadly weapon, with intent to facilitate the commission of robbery or rape or the flight therefrom, and one count of robbery in the first degree, while armed with a deadly weapon, all arising out of the May 1 incident. The jury returned a verdict of guilty on both counts, with a special finding that Friederick abducted Ms. R. with intent to rape and not with intent to facilitate robbery or flight therefrom. The jury also found that Friederick was armed with a deadly weapon with respect to both counts.

FOURTH AMENDMENT ISSUES

Friederick first contends that his arrest was illegal for lack of probable cause, and that all statements and evidence taken from him incident to the arrest should have been suppressed. He argues that he was under arrest from the time that Officer Palacol ordered him to "Stop. I want to talk to you," and that probable cause to arrest was lacking at that time.

A Fourth Amendment seizure occurs when the individual's freedom of movement is restrained by a show of force or authority, such that "in view of all of the circumstances . . . a reasonable person would have believed that he was not free to leave." *State v. Stroud,* 30 Wn. App. 392, 395, 634 P.2d 316 (1981). A reasonable person would not flee a police officer's order to stop, so Officer Palacol's statement resulted in a seizure for purposes of the Fourth Amendment.

Not every such seizure, however, is an arrest requiring probable cause. A narrow exception to the probable cause requirement provides that "police may briefly detain and question an individual", although probable cause is lacking, "if they have a well founded suspicion based on objective facts that he is connected to actual or potential criminal activity." *State v. Sieler,* 95 Wn.2d 43, 46, 621 P.2d 1272 (1980); *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Whether police contact is an investigatory stop rather than an arrest requiring probable cause depends on the scope (questioning) and duration (brief) of the contact. Because Friederick fled from his initial encounter with Officer Palacol, before the officer had done more than ask him to stop, we cannot say that the contact constituted an arrest rather than an investigatory stop. The legality of the contact thus depends only on whether Officer Palacol had a well founded suspicion based on articulable facts sufficient to justify an investigatory stop. *Sieler.*

The well founded suspicion required for an investigatory stop may be based on information obtained from another

person so long as the tip has sufficient indicia of reliability: it must either have been received under circumstances suggesting the informant's reliability, or the police officer must have made corroborative observations suggesting either criminal activity or that the informant's information was obtained in a reliable fashion. *State v. Lesnick,* 84 Wn.2d 940, 530 P.2d 243 *cert. denied,* 423 U.S. 891 (1975). Here the informant was a hotel security guard and former police officer, had personally observed Friederick's suspicious behavior in the hotel, had told Officer Palacol of his suspicions, and had relayed to Officer Palacol the description of the rapist involved in the May 16 incident. Officer Palacol also knew of the May 16 incident at the Park Hilton through police channels, and had been told by the dispatcher that the hotel guards were following a suspect in that rape. Absent some reason to doubt Cole's word, Officer Palacol could act on Cole's suspicions. *Lesnick.* The effort to stop Friederick was justified and legal under the Fourth Amendment.

■ Once Friederick ran from Officer Palacol, the police were justified in using more force to effect the stop. Officer Wabschall witnessed Friederick's flight from Officer Palacol and knew that Friederick was a possible rape suspect, potentially armed and dangerous. It was reasonable for Officer Wabschall to draw his weapon to effect the stop. In view of the suspect's flight and the violent nature of the suspected crime, it was also reasonable for police to handcuff Friederick in effecting the stop. *State v. Wakeley,* 29 Wn. App. 238, 243 n.1, 628 P.2d 835 (1981).

■ It is undisputed that Officer Guillen was frisking Friederick for weapons when the bulky ski gloves fell from under his shirt. Officer Guillen then placed the defendant under arrest. An officer has probable cause to arrest when she has objective information sufficient to justify a reasonable and cautious person in the belief that a felony has been committed and that the individual being arrested committed the crime. *State v. Scott,* 93 Wn.2d 7, 604 P.2d 943, *cert. denied,* 446 U.S. 920 (1980). Flight is circumstan-

tial evidence of guilt and thus an element of probable cause. *State v. Baxter,* 68 Wn.2d 416, 413 P.2d 638 (1966). Officer Guillen knew of the prior rape and immediately connected Friederick with it when she saw the ski gloves. She knew that he had been followed as a possible rape suspect, and had taken to his heels when approached by police. Officer Guillen had probable cause to arrest. The trial court did not err.

## EVIDENCE OF PRIOR CONVICTIONS

Friederick next contends that the trial court abused its discretion by ruling that the State could introduce evidence of two prior unnamed felony convictions to impeach Friederick's credibility if he testified. The court had first ruled, after balancing the factors of *State v. Alexis,* 95 Wn.2d 15, 621 P.2d 1269 (1980), that the prejudicial effect of two prior convictions for rape and kidnapping outweighed their probative value, but then reversed itself and ruled the convictions admissible so long as the prosecution did not identify the nature of the crimes.

Our review of the record demonstrates that the trial court properly balanced the *Alexis* factors and ruled in favor of admitting unnamed convictions. The trial court's careful evaluation of the various factors is on the record. *See State v. Moore,* 29 Wn. App. 354, 628 P.2d 522 (1981), *appeal after remand,* 33 Wn. App. 55, 651 P.2d 765 (1982). There was no abuse of discretion.

## EVIDENCE OF OTHER ACTS

Friederick next contends that the trial court committed prejudicial error by admitting "evidence of the May 16 rape and the defendant's conduct on May 17." With respect to the May 16 rape of Ms. S., however, we note that the trial court ruled that Cole could testify only to what he himself observed. Neither hearsay nor any reference to a rape was allowed into evidence. The full extent of Cole's testimony in this regard is set out in the margin.[1]

---

[1] "Q. In May of 1981, on May 16th of 1981, were you employed as a security

■ Evidence of unrelated crimes and bad acts may be admitted, in the trial court's discretion, where the evidence is "logically relevant to a material issue before the jury", *State v. Saltarelli*, 98 Wn.2d 358, 362, 655 P.2d 697 (1982), and necessary to prove an essential ingredient of the crime charged. ER 404(b); *State v. Goebel*, 40 Wn.2d 18, 240 P.2d 251 (1952). "[I]f the evidence is relevant, its probative value must be shown to outweigh its potential for prejudice." *Saltarelli*, at 362. The record reflects careful consideration of the issue by the trial court during argument on Friederick's motion in limine.

One of the elements of first degree kidnapping (RCW 9A.40.020) is that the abduction occur with intent to facili-

---

officer working at about 5:30 in the evening of May 16th?

"A. Yes, sir.

"Q. On that date, did you have an occasion to respond to a call for assistance inside the hotel?

"A. Yes, sir.

"Q. To what location in the hotel did you respond?

"A. I believe it was on the 24th floor.

"Q. At that location, did you meet a woman identified as [S]?

"A. Yes, I did.

"Q. Could you, please, describe in your own words what her demeanor and physical appearances [*sic*] appeared to be when you first met her.

"A. The young lady was very upset, crying, sitting down very disturbed.

"Q. Where did you meet her?

"A. I met her in one of the hotel rooms.

"Q. Was there anyone else there?

"A. Yes, there was.

"Q. Who was there?

"A. There was another lady and a gentleman who worked at the front desk.

"Q. And how long did you stay with this woman inside the hotel room?

"A. Not too long.

"Q. Did you subsequently go down to the lobby for the purposes of looking for a person?

"A. For a person. I am sorry. I don't understand what you are asking.

"Q. Let me withdraw that question. Approximately how long was it that you stayed in the room with Miss [S]?

"A. Three minutes.

"Q. After you were in the room, did you contact the police or were the police contacted?

"A. Right. I returned later to the same room and I met with Seattle Police Department and their personnel."

tate the commission of a felony. Proof of the May 16 event, the defendant's statements concerning intercourse with a prostitute, and the defendant's conduct on May 17, plus the presence of ski gloves and a knife, was relevant and necessary to circumstantially prove Friederick's intent with respect to the May 1 incident. The probative value of this evidence, as limited by the trial court, outweighed the prejudice. *Saltarelli.* The trial court did not err.

Friederick also contends that the trial court erred in failing to give a limiting instruction as to the use of evidence concerning other acts admitted under ER 404. Friederick argues, citing *State v. Passafero,* 79 Wn.2d 495, 487 P.2d 774 (1971), that the trial court had an obligation to instruct the jury sua sponte on the limited admissibility of this evidence regardless of the defendant's wishes. In *Passafero,* the trial court instructed the jury, over defense objections, that evidence of the defendant's prior convictions could not be considered as evidence of guilt of the crime charged. The defendant argued that he had a right to elect to have this instruction given or not given. The Supreme Court disagreed, holding that the instruction properly stated the law and that "[t]he trial court, not the defendant, instructs the jury." 79 Wn.2d at 498.

*Passafero* therefore does not stand for the proposition argued by Friederick, that the trial court must in all cases give a limiting instruction. The record shows here that the State requested such an instruction and Friederick asked that it not be given, presumably because such emphasis on this evidence could harm as well as help his client. This court will not second guess tactical decisions by trial counsel. *See State v. Ermert,* 94 Wn.2d 839, 621 P.2d 121 (1980). Having decided not to request a limiting instruction below, Friederick may not now assert this decision as error. *State v. Kroll,* 87 Wn.2d 829, 558 P.2d 173 (1976).

### SUFFICIENCY OF EVIDENCE

Friederick finally contends that his robbery convic-

tion must be reversed because no rational trier of fact could have found beyond a reasonable doubt that Friederick took property from Ms. R. by force or against her will. A challenge to the sufficiency of the evidence in a criminal case requires this court to review the evidence in the light most favorable to the State, and to determine whether a rational trier of fact could find the elements of the crime beyond a reasonable doubt. *State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980). From Ms. R.'s testimony, the jury could conclude beyond a reasonable doubt that Friederick, displaying a deadly weapon, took the money from Ms. R. and that at the time Friederick accepted the money, he intended to retain it through force. The fact that Ms. R. offered Friederick the money if only he would let her go is immaterial.

Affirmed.

DURHAM, J., concurs.

ANDERSEN, C.J., concurs in the result.