[Nos. 7666-1-III; 7794-2-III.   Division Three.   March 22, 1988.]

THE STATE OF WASHINGTON, *Respondent*, v. KEVIN R. BELIEU, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. KEVIN R. BELIEU, *Defendant*, RONALD M. BLOUNT, *Appellant*.

*Michael Kinkley,* for appellant Belieu (appointed counsel for appeal).

*Lewis Schrawyer,* for appellant Blount (appointed counsel for appeal).

*Donald C. Brockett, Prosecuting Attorney,* and *Patricia Thompson* and *Neil Korbas, Deputies,* for respondent.

THOMPSON, J.—Kevin Belieu was convicted, on stipulated facts, of being a felon in possession of a handgun, and third degree possession of stolen property. He appeals the denial of his motion to suppress. Ronald M. Blount appeals his convictions for two counts of second degree burglary and one count each of attempted second degree burglary and second degree possession of stolen property. Because both cases stem from the same encounter with Spokane police officers, and both turn on the lawfulness of that encounter, we have consolidated them for purposes of this opinion. We reverse in both cases.

On October 21, 1985, at approximately 9:30 p.m., Steven Duffy telephoned the 911 operator to report someone had just come to his door and asked to use the phone, allegedly because his car was disabled. Mr. Duffy told the operator he suspected his home was being cased for burglary. He described the individual who came to the door as having a beard and wearing jeans and a dark jacket. Officer Poole received a radio report of Mr. Duffy's suspicions and proceeded to the 2600 block of East Heroy in Spokane, Washington. Upon arriving in the area at approximately 9:46 p.m. he noticed two men walking west on Heroy Avenue, one generally matching Mr. Duffy's telephone description. He did not stop the men, but radioed his observations to other officers in the area.

Officer Fertakis also heard the initial radio report of the 911 call and drove to the area in an unmarked vehicle. He also saw two men walking, and additionally noticed the parked car. When he drove up behind the parked car, the driver slid down in his seat, and as the two individuals on foot walked by the car, they looked back. He was told by Officer Lindskog, also in the area, to drive away, which he did.

Officer Lindskog saw the two men, assumed to be the same two observed by Officers Poole and Fertakis, walking east on Hoffman, around the corner from the parked car. He saw them run back toward the area where Officer Fertakis had reported seeing the car, and then Officer Lindskog saw a vehicle coming his way from that direction. Before the headlights were turned on, he could see the passenger in the front seat bend forward.

Thereafter, Officers Giese and Stanley, driving an unmarked car with red and blue grille lights, assisted by Officers Lindskog, Poole, and Fertakis, followed shortly thereafter by other units, effected a full felony stop of the vehicle with guns drawn. All four occupants of the vehicle were ordered out of the car, hands behind their heads, and one at a time they were handcuffed, secured, and separated. No questions were asked until all were secured. After a passenger in the rear seat was removed from the car, a rifle which appeared to be altered was seen on the rear floor.

When Mr. Belieu got out of the car, he was patted down by Officer Stanley, who removed a small leather pouch and a canvas pouch from his pockets. During this search, a ring, later determined to be stolen, fell out of Mr. Belieu's pocket.

Thereafter, Mr. Blount, the driver, was questioned. Based on the searching officer's belief he had Mr. Blount's consent, he searched the car.[1] Two handguns were found:

---

[1]The trial court in State v. Belieu declined to hold Mr. Blount gave consent to search. Because of our disposition of the *Terry* stop issue, we need not address this point. *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

one under the driver's seat and one under the passenger's seat. The under–seat area was so cluttered the guns could not have been passed under the seat from the front to back of the car. Mr. Belieu was charged with being a felon in possession of a handgun, based on a prior conviction for second degree robbery and the location of the .38 caliber revolver under the passenger seat where he had been seated. A charge of second degree possession of stolen property was later added, based on the ring that fell from his pocket.

Approximately 10 minutes after the stop, it was determined Mr. Blount had an outstanding arrest warrant for a traffic violation. He was placed under arrest pursuant to the warrant.

One of the passengers, Brian Anderson, admitted that he had committed several burglaries with Mr. Blount. Mr. Blount was charged with four counts of second degree burglary, one count of attempted second degree burglary (for the request to use the telephone at Mr. Duffy's home), and one count of second degree possession of stolen property.

Mr. Belieu and Mr. Blount were tried separately. Both made motions to suppress, contending the vehicle stop was unlawful. Both motions were denied by different judges. Mr. Blount was convicted by a jury; Mr. Belieu was found guilty by the court on stipulated facts. Each appeals the denial of his motion to suppress, and raises other contentions we need not address due to our disposition of their primary contentions.

The first issue is whether the trial court erred when it concluded Mr. Belieu did not have standing to challenge the search of the automobile. The trial court concluded Mr. Belieu had no legitimate expectation of privacy in the car, citing *State v. White,* 40 Wn. App. 490, 494–95, 699 P.2d 239, *review denied,* 104 Wn.2d 1004 (1985), and thus lacked standing to challenge seizure of the pistol found underneath the front passenger seat. *White* held a passenger

arrested for robbery and assault had no standing to challenge seizure of a gun found in the rear passenger compartment of the vehicle after his arrest, notwithstanding Washington's adherence under article 1, section 7 of the Washington State Constitution to the "automatic standing" rule.

■ The Court in *United States v. Salvucci,* 448 U.S. 83, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980) overruled the automatic standing rule of *Jones v. United States,* 362 U.S. 257, 4 L. Ed. 2d 697, 80 S. Ct. 725, 78 A.L.R.2d 233 (1960). *State v. Simpson,* 95 Wn.2d 170, 622 P.2d 1199 (1980) rejected the federal approach by independently requiring automatic standing for possessory offenses under article 1, section 7 of the Washington State Constitution. In doing so, the court reaffirmed *State v. Michaels,* 60 Wn.2d 638, 646–47, 374 P.2d 989 (1962) and its requirements for automatic standing to challenge a search and seizure: (1) the offense with which defendant is charged must involve possession as an "essential" element of the offense; and (2) the defendant was in possession of the contraband at the time of the contested search or seizure. Here, possession is an essential element of the felon in possession charge.

However, the State argues because Belieu had no possessory interest in the *car,* he could not show the second prong, *i.e.,* possession at the time of the search. We hold that under *Simpson,* Mr. Belieu can challenge the seizure, notwithstanding *White.* The gun was under *his* seat, not in the rear as in *White.* Also, he was charged with possession of that gun and his presence in the seat was to be used as proof of possession. While *United States v. Salvucci, supra,* in overruling *Jones,* allowed the prosecutor to take such a seemingly inconsistent position, this was because the inquiry turned on the defendant's legitimate expectation of privacy. In Washington, the inquiry is fundamentally different, and requires a defendant be able "to assert a violation of privacy as a result of impermissible police conduct at least in cases where, as here, a defendant is charged with

possession of the very item which was seized". *Simpson,* at 180.

We now turn to the issue of whether the car stop was lawful. Although the conclusions reached by the two judges are the same in each case regarding the legality of the stop, their reasoning and basis differed. In State v. Blount, the court held the intrusion was a reasonable investigatory stop, based on *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In State v. Belieu, the court concluded police had probable cause to arrest when the stop was made. However, on appeal the State in both cases has focused its argument on whether the stop would qualify under *Terry,* conceding probable cause did not arise until sometime later, after the individuals were in custody. This usually necessitates a 2–question analysis: (1) whether officers possessed articulable suspicion of criminal activity to justify a *Terry* detention, *i.e.,* information leading them to a belief there was a substantial possibility of criminal conduct, *State v. Kennedy,* 107 Wn.2d 1, 6, 726 P.2d 445 (1986); and (2) whether officers exceeded the "scope" of a permissible investigatory stop. *See State v. Williams,* 102 Wn.2d 733, 689 P.2d 1065 (1984).

But we need not discuss the first prong. Assuming the premise that reasonable officers, trained to detect crime, could legitimately seek an explanation from the suspects to dispel or confirm their suspicions, we hold the full felony stop executed by those officers far exceeded the scope of a permissible investigatory stop.

■ It is clear for a police/citizen encounter to be properly categorized as a *Terry* stop, the investigative methods used must be the least intrusive means reasonably available to verify or dispel the police officer's suspicion in a short period of time. *Florida v. Royer,* 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). Also, the scope of the stop must be reasonably related to the initial justification. *Williams,* at 739–40. The question becomes whether the procedure used here was "'substantially less intrusive' than an arrest". *Michigan v. Summers,* 452 U.S. 692, 702, 69 L. Ed. 2d 340,

101 S. Ct. 2587 (1981). This is necessary to determine whether in fact police conducted a *Terry* stop, or whether *constitutionally* there was a full–blown arrest. If the intrusion is not a limited intrusion "roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny", *Dunaway v. New York,* 442 U.S. 200, 213, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979), then officers must have probable cause to arrest.

Here, the intrusiveness of the stop is remarkably similar to *State v. Williams, supra.* In *Williams,* officers were answering a request by a radio dispatcher to investigate a silent burglar alarm at a nearby residence. Upon arrival, the officers noticed a car starting to move away with headlights on. The officers made a full felony stop, as here. In holding the intensity and scope of the intrusion excessive, the court noted police did not question the defendant, but first ordered him out of the car, frisked him, handcuffed him, and placed him in a squad car. They then investigated the suspected crime. In this case, police did likewise. Moreover, here, police lacked the information officers possessed in the *Williams* case that a specific crime was being committed.

Nor did the officers in this case have information the suspects were armed and dangerous, which might justify the felony stop procedure. *See Williams,* at 740 n.2. Although Officer Lindskog testified he saw a passenger bend forward in his seat before the headlights were turned on, there was no indication his suspicions or observations were transmitted to the other officers prior to the decision to employ a guns–drawn felony stop. Nor will general knowledge handguns have been stolen in recent residential burglaries justify a felony stop such as here without some link to these individuals. This was not an investigatory stop. As a practical matter, Mr. Belieu and Mr. Blount were under arrest when they were ordered out of the vehicle at gunpoint and handcuffed. *Florida v. Royer,* 460 U.S. at 503. *See also Hayes v. Florida,* 470 U.S. 811, 84 L. Ed. 2d 705, 105 S. Ct. 1643 (1985).

It should be emphasized that handcuffing a suspect, or placing him in a patrol car, *may* be justified within the *scope* of a valid investigatory stop, *see State v. Wheeler,* 108 Wn.2d 230, 236, 737 P.2d 1005 (1987). However, the additional intrusion of transporting the suspect a short distance to the scene of the crime is reasonable only when a crime has been reported. 3 W. LaFave, *Search and Seizure* § 9.2, at 26 (Supp. 1986), *cited in Wheeler,* at 237. No crime had been reported here. The conclusion from *Wheeler* must be that a significant intrusion, such as a full felony stop, can be justified only when more than mere suspicion of criminal activity is present.

While the degree of intrusion utilized by the police officers in this case might be upheld in certain circumstances, *see* 3 W. LaFave, *Search and Seizure* § 9.2(d), at 364 n.65 (1987), no case similar on its facts has been found in which a full felony stop, with guns drawn, followed by handcuffing and frisking the car's occupants, has been found less intrusive than an arrest. If it were otherwise, the *Terry* exception to the probable cause requirement would swallow the general rule that probable cause is ordinarily required. *Dunaway v. New York,* 442 U.S. at 213.

Several cases from the Ninth Circuit Court of Appeals reinforce this conclusion. In *United States v. Strickler,* 490 F.2d 378 (9th Cir. 1974), police officers, involved in surveillance of a residence where cocaine was being sold, observed a Cadillac whose occupants showed some interest in the home in question. A woman walked from the area where the car was parked toward the residence. The car was stopped, using the same full felony procedure as here. The court held this armed approach to a surrounded vehicle could not be equated with a *Terry* stop. It held the arrest was complete upon the officer's initial contact with the suspects. The court found it unnecessary to discuss whether the circumstances would have justified a mere investigatory stop.

Recently, in *United States v. Robertson,* 833 F.2d 777, 780 (9th Cir. 1987), the court held officers arriving at a

home suspected of being a methamphetamine lab to serve an arrest warrant effectively arrested a woman leaving that residence when several officers stopped her at gunpoint. The court held such an intrusive encounter could not be equated with *Terry*. *See also Kraus v. County of Pierce*, 793 F.2d 1105, 1108–09 (9th Cir. 1986), *cert. denied*, ___ U.S. ___, 94 L. Ed. 2d 763, 107 S. Ct. 1571 (1987); *United States v. Vasquez*, 638 F.2d 507, 522 (2d Cir. 1980), *cert. denied*, 454 U.S. 975 (1981); *United States v. Ramos–Zaragosa*, 516 F.2d 141, 144 (9th Cir. 1975).

We emphasize we do not require our police officers to provide easy targets for dangerous individuals. When officers have a reasonable belief a car's occupants are armed and dangerous, they may make a stop at gunpoint. *United States v. Ceballos*, 654 F.2d 177, 182–84 (2d Cir. 1981); *United States v. Beck*, 598 F.2d 497 (9th Cir. 1979); *United States v. Ramos–Zaragosa, supra; State v. Williams, supra* at 740; *State v. Samsel*, 39 Wn. App. 564, 573, 694 P.2d 670 (1985); *cf. United States v. Hensley*, 469 U.S. 221, 235, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985) (drawn gun reasonable when officer had specific report suspect armed and dangerous); *State v. Friederick*, 34 Wn. App. 537, 542, 663 P.2d 122 (1983) (drawn gun used to stop suspect upheld where suspect ran after being told to stop and he was a suspect in a violent crime, and was potentially armed and dangerous). However, this was not a case where a lone officer attempted to stop a car containing several suspects under potentially dangerous circumstances; Officer Lindskog had adequate backup immediately on the scene. We hold the facts known and articulated by the police officers here did not give rise to a reasonable belief these individuals, in this car, were armed and dangerous. Thus, police exceeded the permitted scope of an investigatory stop, transforming this "stop" into an arrest. As in *Williams*, probable cause to arrest would be required to justify the detention and search of Mr. Belieu and Mr. Blount.

The State conceded at oral argument probable cause to arrest did not develop until the guns were seen *after* the

stop as to Mr. Belieu, and until the arrest warrant was discovered as to Mr. Blount. Thus, while subsequent events may have produced the necessary probable cause to arrest the defendants, at the time they were actually arrested, those events had not yet transpired. *See State v. Gonzales,* 46 Wn. App. 388, 396, 731 P.2d 1101 (1986). The dissent correctly points out that this encounter revealed much more as the events unfolded. However, when analyzing whether the articulable suspicions of the officers justified this high degree of force, what was later revealed must not be considered. The officers did not see the weapons referred to in the dissent until *after* the suspects were effectively arrested. Our sentiments match those of the court in *United States v. Ramos–Zaragosa,* 516 F.2d at 145:

> We realize this state of affairs is not an entirely happy one for law enforcement officials. It is not surprising that such poorly marked boundaries are sometimes transgressed. Our task, however, is to preserve the markings as best we can. We cannot do this by pretending they do not exist.

Because the stop was unlawful, evidence seized must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. Larson,* 93 Wn.2d 638, 611 P.2d 771 (1980); *State v. Tocki,* 32 Wn. App. 457, 648 P.2d 99, *review denied,* 98 Wn.2d 1004 (1982). We therefore reverse both convictions.

McINTURFF, C.J., concurs.

GREEN, J. (dissenting)—I disagree with the majority's conclusion the stop was overly intrusive and therefore I respectfully dissent.

There are three factors the court considers in determining whether an intrusion is permissible under *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), or must be supported by probable cause: (1) the purpose of the stop; (2) the amount of physical intrusion upon the suspect's liberties; and (3) the length of time the suspect is detained. *State v. Wheeler,* 108 Wn.2d 230, 235, 737 P.2d

1005 (1987); *State v. Williams*, 102 Wn.2d 733, 740, 689 P.2d 1065 (1984). "The purpose of a stop must be related to an investigation focused on the defendant." *Wheeler*, at 235. The scope of an investigatory stop may be enlarged or prolonged as required by the circumstances if the stop confirms or arouses further suspicion. *State v. Guzman–Cuellar*, 47 Wn. App. 326, 332, 734 P.2d 966, *review denied*, 108 Wn.2d 1027 (1987). Also, if the results of the initial investigation do not dispel the officer's suspicion criminal activity is afoot, he may further detain the suspect and continue the investigation by doing what is reasonably necessary under the circumstances. *State v. Mercer*, 45 Wn. App. 769, 775–76, 727 P.2d 676 (1986). The stop must be temporary, however, and last no longer than is necessary to carry out the purpose of the stop, *State v. Gonzales*, 46 Wn. App. 388, 394, 731 P.2d 1101 (1986), and the investigative methods must be the least intrusive means reasonably available to verify or dispel the officer's suspicion. *Gonzales*, at 394 (citing *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983)).

With respect to the first factor, the purpose of the stop here was to ask the four men in the car who they were and what they were doing in the vicinity. The officers were seeking to determine whether the four men were in fact "casing" houses to burglarize. They had been informed by radio of suspicious persons possibly casing houses and were given a description of one of the men. One of the four resembled the described person. It is clear the investigation focused on the four men detained.

As to the second factor, it is evident the amount of intrusion was significant. The question is whether it was reasonable. In certain circumstances, drawn guns, handcuffing, or seclusion of the suspect may be appropriate but only when the police have a legitimate fear of danger. *Wheeler*, at 236. Under extreme circumstances, the combination of all three responses, drawn gun, handcuffs and seclusion, may be warranted. *Williams*, at 740.

A determination of the reasonableness of an officer's intrusion depends to some degree on the seriousness of the apprehended criminal conduct. An officer may do far more if the suspected misconduct endangers life or personal safety than if it does not.

*State v. Samsel,* 39 Wn. App. 564, 573, 694 P.2d 670 (1985) (quoting *State v. McCord,* 19 Wn. App. 250, 253, 576 P.2d 892, *review denied,* 90 Wn.2d 1013 (1978)). The officer need not be absolutely certain the suspect is armed. Rather, the question is whether a reasonably prudent man in the same situation would be warranted in the belief his safety or that of others is in danger. *State v. Sweet,* 44 Wn. App. 226, 233–34, 721 P.2d 560 (quoting *Terry,* at 27), *review denied,* 107 Wn.2d 1001 (1986). The officer's belief is reasonable only if he or she can point to "particular facts" from which reasonable inferences of danger may be drawn. *Sibron v. New York,* 392 U.S. 40, 64, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968). The questions raised regarding the validity of a frisk concern how much suspicion the officer must have that the suspect is possibly armed and dangerous, whether the test is objective or subjective, and also the extent to which the officer may search the suspect and the surrounding area. *State v. Kennedy,* 107 Wn.2d 1, 11, 726 P.2d 445 (1986).

Mere placement in the patrol car to preserve the status quo does not necessarily exceed the scope of a *Terry* stop. *Gonzales,* at 395. Also, handcuffing and placing a suspect in the backseat of a patrol car are appropriate procedures when a suspect is being transported in the police car—such action is consistent with good police practice and common sense. *Wheeler,* at 236. Furthermore, an officer conducting a *Terry* investigatory stop may be in danger not only from the suspect but also the suspect's companions, and thus an officer may frisk the companions if the officer could lawfully frisk the driver, especially where the companion is in the suspect's car. *State v. Kennedy, supra.* However, the suspected crime of burglary by itself does not support an inference of dangerousness. *Williams,* at 740; *Sweet,* at 234.

Thus, the question presented here is whether, considering all the circumstances and the legitimate concern for police safety consistent with good police practice and common sense, *Wheeler,* at 236, the police acted reasonably in making the stop with drawn guns and then frisking, handcuffing and separating the occupants of the vehicle. In resolving this question, a police officer's expertise in identifying criminal behavior must be given consideration. *State v. Fricks,* 91 Wn.2d 391, 398, 588 P.2d 1328 (1979); *State v. Cottrell,* 86 Wn.2d 130, 542 P.2d 771 (1975); *State v. Stebbins,* 47 Wn. App. 482, 484, 735 P.2d 1353, *review denied,* 108 Wn.2d 1026 (1987); *State v. Samsel, supra.* In my view, they acted reasonably.

These facts were known to the officers. It was around 9:30 p.m. and it was dark. They knew there had been numerous burglaries in this particular area in which guns had been taken. Indeed, these officers were engaged in surveillance of another potential burglary in the same area at the time they received the call that Mr. Duffy had reported he thought his house was being "cased" for a possible burglary. The report indicated two men rang his doorbell, and when he answered, they stated their car was disabled and requested use of his telephone. On receiving the radio report, the officers went to the block where Mr. Duffy lived and found a white Ford Torino parked in the middle of the block. Two men were approaching the car as one of the officers driving an unmarked police car slowly pulled up behind the Torino. One of the men met the description given by Mr. Duffy. As the officer's car was parking behind the Torino, the two men walked past the car and looked back; the person sitting in the car "slouched down" in his seat and leaned slightly to the left. This officer was instructed by radio not to remain behind the car. As he was leaving, he observed the two men walk to the end of the block and turn right. Another officer observed the two men walking on the sidewalk. When they reappeared, they were "running hard" back to the Torino. They got into the car, which had apparently been reported disabled, started the

engine and without lights began moving into the traffic lane. This information was radioed to the other officers. After moving for a short distance, the lights of the Torino were turned on. The police made a decision to stop the car. As one officer approached the car in his vehicle from the opposite direction, he observed the passenger in the front seat bend or slouch forward as if doing something in the front seat. This officer then blocked the path of the defendants' vehicle, while two other unmarked police cars pulled along the side and rear of the Torino. One of these vehicles had turned on the flashing police lights hidden behind the radiator grille.

The officers approached the car with guns drawn and ordered the occupants to get out of the car. As the driver exited the car, a knife was readily observed. As one of the passengers exited the rear of the car, a rifle with a short-ened stock was observed in plain view. The occupants were frisked, handcuffed and separated.

In these circumstances, the officers were warranted in the belief their safety might be endangered by the stop. This belief rested on particular facts from which reasonably prudent persons could believe there was danger involved. A reasonable inference from the actions of defendants as observed by the police confirmed Mr. Duffy's report his house was being "cased" for potential burglary. Knowing that guns had been taken in previous burglaries in the neighborhood alerted the officers to the fact guns might be present in the defendants' vehicle. This concern was reinforced when the officer saw the passenger in the front seat bend forward as if doing something in the front seat—a reasonable inference he was obtaining or loading a gun. Thus, in my view, there were ample particular facts to support the use of guns in making the stop.

Further, the frisking, handcuffing and separating of the occupants was clearly justified by the unfolding events. As Mr. Blount, the driver, exited the car, a knife was readily observed on his person—in fact, he made movements suggesting the use of it. As the passengers in the backseat

exited, a rifle with the stock sawed off was in plain view behind the front seat. Within 10 minutes, it was learned there was an outstanding warrant for Mr. Blount's arrest. Upon a search of the vehicle, a loaded pistol was found under the driver's seat and a second loaded pistol was found under the passenger's front seat. The rifle was also loaded. These unfolding events clearly justified the frisking, handcuffing and separating of the occupants.

For the foregoing reasons, I conclude the stop was justified and the officers' conduct was not overly intrusive in light of all the circumstances.

Mr. Blount contends there was insufficient evidence to support his conviction of attempted second degree burglary. I find sufficient facts to support his conviction. The record establishes he took a substantial step toward the commission of a burglary when he rang the doorbell of Mr. Duffy's house to determine if anyone was home. One of the occupants of the vehicle with Mr. Blount stated he had accompanied Mr. Blount on several other burglaries and if Mr. Duffy had not been at home, they planned to burglarize his house. The evidence established that the Duffy house looked dark as the drapes were drawn and no outside lights were on. In contrast, Mr. Duffy stated the other homes in the area had their outside lights on and were "lit up like Christmas trees."

In my view, the defendants' convictions should be affirmed.

Review granted by Supreme Court July 5, 1988.