547 So.2d 215 (1989)
Willie James WILSON, Appellant,
v.
STATE of Florida, Appellee.
No. 87-2897.
District Court of Appeal of Florida, Fourth District.
July 7, 1989.
Rehearing Denied August 30, 1989.
*216 Richard L. Jorandby, Public Defender and Louis G. Carres, Asst. Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee and Mardi Levey Cohen, Asst. Atty. Gen., West Palm Beach, for appellee.
STONE, Judge.
The defendant entered a plea to possession of a controlled substance, reserving the right to appeal an order denying a motion to suppress. The issue on appeal is the extent to which officers who are executing a search warrant may physically restrain persons found on the premises in order to secure the area. The trial court's findings reflect that a tactical unit of officers, executing a search warrant for drugs at a residence, found the defendant outside the house near the front door. He was leaning up against the house while sitting on a box next to a table. It was after dark and the house was located in an area of high crime and drug activity. As the police entered, with guns drawn, the defendant, along with three or four other men who were present, was told to get on the ground and was handcuffed. This was a standard precaution used for the protection of the officers and others when securing an area under these circumstances. The department's experience had shown that under these conditions aggressive behavior and resistance by those at the scene was not uncommon, and that there was a likelihood of firearms being present.
Miranda warnings were read to all present, and a deputy asked the defendant if there was anything on his person that he should know about. The defendant immediately confessed to possessing drug paraphernalia in his shoe. The trial court found that the detention was reasonable, and that the subsequent search of the defendant was permissible because he stated that he had contraband on his person.
In Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Supreme Court determined that police, executing a search warrant upon a tavern and its bartender, had no right to search customers in the bar in the absence of a reasonable suspicion that the patron posed a threat. This case, however, differs from Ybarra in several respects. In Ybarra there was no factual basis to conclude that the officers had reasonable grounds to conduct a search of the customers. Additionally, there was no reason to believe that Ybarra was anyone other than a customer. The court noted that Ybarra said and did nothing suspicious. Thus, it was not reasonable for the officers to fear for their safety from the defendant and there was nothing about his physical location or appearance to connect him to either the bartender or the bar.
Here, on the other hand, there were reasonable articulated grounds to secure the defendant, who the officers, in the exigency of serving the warrant, could reasonably perceive as posing a threat to their safety,[1] and to the security of the premises. *217 See generally Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Harper v. State, 532 So.2d 1091 (Fla. 3d DCA 1988), rev. denied, 541 So.2d 1172 (Fla. 1989); State v. Ruiz, 526 So.2d 170 (Fla. 3d DCA), rev. denied, 534 So.2d 401 (Fla. 1988); Morganti v. State, 498 So.2d 557 (Fla. 4th DCA 1986); Zaner v. State, 444 So.2d 508 (Fla. 1st DCA 1984). But see Julian v. State, 528 So.2d 427 (Fla. 2d DCA 1988).
A lawful temporary seizure and detention is not automatically converted into an unlawful arrest because the officers at the scene elect to handcuff a defendant rather than use some other method of restraint for their protection such as holding him on the ground at gunpoint. See generally United States v. Bautista, 684 F.2d 1286 (9th Cir.1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983); State v. Ruiz, 526 So.2d 170 (Fla. 3d DCA 1988).
The trial court did not abuse its discretion by considering the totality of the circumstances and finding that the decision to restrain the defendant under these conditions was a reasonable and lawful procedure, and that the restraint was temporary. Had the contraband not been uncovered, the defendant, if unarmed, would have been free to leave. Nor did the court err in treating the defendant, who might well have been guarding the door, as an occupant of the premises.
Therefore, the judgment and sentence are affirmed.
WALDEN, J., concurs.
GLICKSTEIN, J., dissents with opinion.
GLICKSTEIN, Judge, dissenting.
The majority has put its imprimatur on the routine handcuffing of all persons who are in or near a house where police are about to execute a search warrant, merely because sometimes people present may be dangerous. I think the cases show that there needs to be a much stronger ground than this for such intrusion into a person's Fourth Amendment rights.
My colleagues acknowledge dissonance if not outright conflict with the opinion in Julian v. State, 528 So.2d 427 (Fla. 2d DCA 1988). There the appellate court reversed the trial court's denial of a suppression of evidence motion, holding that the defendant's mere presence on the curtilage of a mobile home being subjected to a warranted search could not furnish a reasonable connection to the suspected narcotics activity which, according to the search warrant, was the required predicate to search of the defendant. Upon arrival to conduct the search of the mobile home the police had, according to plan, detained several persons standing around in the yard. Although these persons were not acting in a suspicious manner, they were not allowed to leave until each had been searched.
The case authorities on which my colleagues rely are all sufficiently different to make their reliance unjustified. The defendant in Harper v. State, 532 So.2d 1091 (Fla. 3d DCA 1988), rev. denied, 541 So.2d 1172 (Fla. 1989), was taken down and handcuffed when found standing next to the counter in the kitchen of a crack house, during execution of a warranted search for items used or property taken during an armed robbery and burglary. A quantity of cocaine was in plain view on the counter, and a butane torch was nearby. The circumstances of Wilson's detention in the instant case are described below. They are markedly different.
In State v. Ruiz, 526 So.2d 170 (Fla. 3d DCA), rev. denied, 534 So.2d 401 (Fla. 1988), rev. denied, ___ U.S. ___, 109 S.Ct. 872, 102 L.Ed.2d 995 (1989), the defendant drove up to a house at which officers had made several undercover cocaine purchases just as the officers were executing a search warrant there. Ruiz was ordered to lie prone on the ground but was not handcuffed. He was asked specifically whether he had a gun, not whether he had anything on him that the police should know about before they searched him. Again, the difference *218 from the present facts will be apparent later.
In Morganti v. State, 498 So.2d 557 (Fla. 4th DCA 1986) the characteristics of the detention were in general those of a routine automobile stop, and search of the defendant for weapons was justified by police knowledge that two of the defendant's companions had felony convictions, and the fact that one of the officers had information that the defendant might have been involved in a previous shooting.
Zaner v. State, 444 So.2d 508 (Fla. 1st DCA 1984) concerns detention and patdown of a man accosted by an officer a few feet from the steps leading to the man's apartment just as execution of a warranted search of that apartment was taking place. The officer had been told by a confidential informant that the man customarily carried a gun. The officer took out of the man's hands a brown nylon bag and shaving kit. The contents were a gun and some contraband narcotics. The warrant authorized search of the premises and of any person reasonably believed to be engaged in narcotics trafficking. The police had made "controlled buys" at the apartment. Zaner exhibits a very good fit with the facts and law of Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), as the reader will soon see. The instant case does not.
The facts as detailed in People v. Summers, 68 Mich. App. 571, 243 N.W.2d 689 (1976), aff'd, 407 Mich. 432, 286 N.W.2d 226 (1979), reversed, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), readily show how Michigan v. Summers is distinguished from the instant case and why, contrary to my colleagues' reliance thereon, Summers fails to support the result favored here by the majority.
Summers was exiting his house as the police arrived to execute a search warrant. Officer Lehman stopped Summers and identified himself as a police officer. When the police learned that Summers lived in the house, they ordered him to unlock the door. Summers said that he did not have his keys with him, and would have to use the intercom to get someone inside to open the door. He did so, and instructed the person answering, Dwight Calhoun, to let him into the house. When Calhoun got to the door, and the officer identified himself, Calhoun would not let him in.
The officers quickly knocked down the door. As Lehman chased Calhoun down the hall, another officer, Conant, on Lehman's instructions, escorted Summers inside. Simultaneously other officers secured the house. Lehman saw Calhoun toss a pack of what proved to be heroin onto a bed in the bedroom. Calhoun was arrested and escorted back into the living room. Several other people found in the house were also brought into the living room. Conant proceeded to search the whole house, and found two plastic bags of suspected narcotics under the bar in the basement.
When Conant returned to the living room, Summers again indicated upon questioning that he owned the house and lived there. Summers was then placed under arrest and searched. Two packets of suspected heroin  which suspicion laboratory tests subsequently confirmed, were found on Summers' person. It was this heroin that the trial court suppressed. It was this suppression that the United States Supreme Court reversed.
Compare the above scenario with the facts and circumstances of the instant case. Willie James Wilson was one of four or five black males sitting in front of a residence, located in an area known to the police for drug activity, when police arrived at the residence to execute a search warrant. Wilson was sitting on a speaker box right near the door of the house, and leaning against the wall. Some officers told the men to lie on the ground, and handcuffed them, while others entered the residence. According to a deputy, this was standard procedure as a preface to search of a house. The officer said the same was done with any people inside the house.
A deputy testified that as far as he recalled he read Wilson his rights, as this is standard procedure, before asking him  as the deputy knelt next to him  if he had anything on him the officer should know *219 about before searching him. Wilson told the deputy there was a rock pipe in his shoe. The officer then removed it. The officer said he would in any event have conducted a patdown of Wilson. The patdown would not, however, have extended to removing Wilson's shoe. The officer had never seen Wilson before and did not observe Wilson making any evasive movements or carrying weapons or contraband. The officer said he had not seen Wilson inside the house and did not know when Wilson had come to be where he was.
Wilson unsuccessfully sought to suppress as evidence the glass pipe and the cocaine residue found therein.
In Michigan v. Summers the Supreme Court took it as given that the respondent's detention was a seizure within the meaning of the Fourth Amendment, but not an arrest. The dispute as to whether the respondent's detention violated the respondent's constitutional right to be secure against unreasonable seizure, said the Supreme Court, "involves only the constitutionality of a pre-arrest `seizure' which we assume was unsupported by probable cause." 452 U.S. at 696, 101 S.Ct. at 2591, 69 L.Ed.2d at 345. The seizure in Summers was determined to be significantly less intrusive than an arrest, and able to withstand the scrutiny of the Fourth Amendment reasonableness standard. The intrusion on his privacy was said to fit within a category recognized to exist in Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979): it was so much less severe than that involved in a traditional arrest that the authorities' interest in crime prevention and detection and in the police officers' safety could support the seizure as reasonable.
In its analysis, the Supreme Court relied substantially on the fact that Summers was one of the residents of a house the search of which an objective magistrate had found to be supported by probable cause. 452 U.S. at 701, 101 S.Ct. at 2593, 69 L.Ed.2d at 349. "The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." Id. at 703-04, 101 S.Ct. at 2594-94, 69 L.Ed.2d at 350.
Furthermore, the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention. Moreover, because the detention in this case was in respondent's own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station.
Id. at 701-02, 101 S.Ct. at 2593-94, 69 L.Ed.2d at 349 (footnotes omitted). It is noteworthy that the detention in Summers was distinguished from that which was disapproved in Dunaway, by the fact that "unlike the seizure in Dunaway, which was designed to provide an opportunity for interrogation and did lead to Dunaway's confession, the seizure in this case is not likely to have coercive aspects likely to induce self-incrimination." Id. at 702 n. 15, 101 S.Ct. at 2594 n. 15, 69 L.Ed.2d at 349 n. 15.
A final footnote in the opinion in Summers written by the Court seems to have particular relevance to the instant case:
Although special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case, we are persuaded that this routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant is not such a case.
Id. at 705 n. 21, 101 S.Ct. at 2595-95 n. 21, 69 L.Ed.2d at 351 n. 21.
The usual criterion for distinguishing an arrest from a less intrusive type of detention is, as suggested by the above quotation, the duration of the detention. I submit that use of handcuffs, absent special circumstances, is another. See W.R. LaFave, 3 Search and Seizure § 9.2(d) (1987).
It is true that in some cases where a violent crime is being investigated and *220 there is reason to believe the suspect is dangerous, or that one or more armed accomplices are abroad, or, because of the suspect's evasive conduct or prior self-concealment, that he will flee, use of handcuffs has been approved. See, e.g., United States v. Taylor, 716 F.2d 701 (9th Cir.1983) (suspect refused to raise hands, and made furtive gestures); United States v. Bautista, 684 F.2d 1286 (9th Cir.1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983) (suspected bank robbers' accomplice believed to be in vicinity; suspects nervous and one seemed on the verge of running); State v. Johns, 112 Idaho 873, 736 P.2d 1327 (1987) (officer had had difficulty getting knife away from suspected murderer); State v. Wheeler, 108 Wash.2d 230, 737 P.2d 1005 (1987) (officer had to transport burglary suspect a few blocks); Howard v. State, 664 P.2d 603 (Alaska App. 1983) (violent crime suspected; at least one armed accomplice believed nearby); State v. Aguirre, 130 Ariz. 54, 633 P.2d 1047 (App. 1981) (lone officer to remain with burglary suspect who had acted evasively and hidden earlier); People v. Weeams, 665 P.2d 619 (Colo. 1983) (detainees suspected of armed robberies resulting in one death and one serious injury of a victim; stop late at night in a deserted area); State v. Friederick, 34 Wash. App. 537, 663 P.2d 122 (1983) (suspect had fled; violent crime). However, none of the special circumstances operative in the cited cases was present here.
There are several cases which illustrate circumstances in which handcuffing puts a detention outside the scope of a reasonable warrantless stop. In Floyd v. State, 500 So.2d 989 (Miss. 1986), cert. denied, 484 U.S. 816, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987), the essential facts are as follows. At about 7:30 p.m. one of the state police operating a roadblock for inspection of licenses and car registrations and tags observed two cars pull off into a driveway a short distance before the road block. The officer drove down to investigate. As he approached, one car, a Pontiac, pulled out of the driveway, heading away from the roadblock. This car was driven by one Bruce Allen Boches. The officer stopped him. His documents were not in order, there appeared to be a possibility the car was stolen, and there was the smell of marijuana in the car. The way the car handled suggested it was carrying a heavy load. Meanwhile the other car, an Oldsmobile, had passed through the road block, the driver's license and registration being in order. Needless to say, Boches was arrested. He told police who the other driver was  Donnie Floyd. A BOLO was put out on the car and driver, requesting that the car be stopped and the driver held.
An officer who took up a position along the highway in response to the radio message spotted a car answering the description at about 9:00 p.m. The officer pulled the car over. The driver got out of the car and approached the officer. The officer checked his driver's license and asked him to sit in the front passenger seat of the patrol car. The officer notified his headquarters that Donnie Floyd was in his custody. The officer was told to exercise extreme caution. Thereupon, the officer handcuffed Floyd. Subsequently back up arrived. The police could smell marijuana in the car, and found three bales of it in the trunk. In a subsequent search of the car at the jail, cocaine was found in a plastic bag in a shaving kit on the floor of the car.
The trial court in Floyd refused to suppress the contraband, holding it had not been found as the result of an illegal arrest. The Mississippi Supreme Court held that the police had a reasonable and articulable suspicion to make an investigative stop of Floyd, but not grounds to arrest him without a warrant. Such an arrest requires that the officer have reasonable cause to believe both that a felony has been committed and that this person committed it.
The Mississippi Supreme Court determined that the officer had arrested Floyd no later than when he handcuffed him. At that time there was no reasonable basis for a warrantless arrest. The Court cited among other cases Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), for the implicit principle that an arrest has occurred when the person detained *221 cannot reasonably believe he is free to leave. Accordingly, the subsequent search was unlawful, and its fruits inadmissible. See also People v. Gabbard, 78 Ill.2d 88, 34 Ill.Dec. 751, 398 N.E.2d 574 (1979) (handcuffing of man routinely checked by officer when seen walking along road constituted arrest; officer had no reasonable ground to believe defendant was committing or had committed a felony; documents seized at that time should have been suppressed; statements given much later were not fruits of the illegal arrest but of intervening events, and were admissible); People v. Tebedo, 81 Mich. App. 535, 265 N.W.2d 406 (1978) (investigative stop must be justified at its inception, and its scope reasonably related to the circumstances that justified the interference in the first place; laying detainee on ground and then handcuffing him are not elements of an investigative stop, but of an arrest; mere suspicion not proper justification for warrantless arrest; defendant who, standing about ten feet from his apartment door, was doing nothing suspicious when first observed by police, and who began to run only at sight of police car and not from site of reported crime, did not furnish basis for warrantless arrest  reasonable cause to believe a felony has been committed and defendant committed it; defendant's subsequent statement should have been suppressed); State v. Williams, 102 Wash.2d 733, 689 P.2d 1065 (1984) (intensity and scope of interference with suspect's freedom of movement were improper where defendant, who was observed leaving in his car from the scene of a possible burglary, was ordered from his car, frisked, handcuffed, and placed in squad car, and house was investigated and canine unit sent for, before police asked suspect why he was in the vicinity) (citing, inter alia, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).
I think the opinion for the majority overlooks a crucial element in the instant case. Since the police had no specific reason to fear Wilson, had no knowledge of whether he resided in the house being subjected to a warranted search, and had no more than a suspicion that he might be connected with the contraband expected to be found in the house, putting him to the ground and handcuffing him constituted an arrest rather than an investigatory detention. Since the officer had no reasonable ground to believe that Wilson had committed a felony  albeit arguably he had reason to believe a felony had been committed  the arrest of Wilson was illegal. Even if Wilson was given his Miranda rights, the officer's questioning Wilson, while he was lying on the ground handcuffed, about whether he had anything on him that the police should know about before searching him was illegal, and the crack pipe and its contents were evidence obtained as the fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The officer's conduct in fact very closely resembles that mentioned above which was so staunchly decried in Dunaway, and which was contrasted in Summers with the detention approved of therein.
The evidence found on Wilson's person should have been excluded.
NOTES
[1] For chilling statistics on the number of Florida law enforcement officers shot and killed, or otherwise seriously injured in the line of duty in the past year alone, see Florida Department of Law Enforcement, 1988 Annual Report (1989).