[No. 55075–1.   En Banc.   May 18, 1989.]

THE STATE OF WASHINGTON, *Petitioner*, v. KEVIN R. BELIEU, *Respondent*.

THE STATE OF WASHINGTON, *Petitioner*, v. KEVIN R. BELIEU, *Defendant*, RONALD M. BLOUNT, *Respondent*.

*Donald C. Brockett, Prosecuting Attorney,* and *Neil H. Korbas* and *Patricia A. Thompson, Deputies,* for petitioner.

*Michael D. Kinkley,* for respondent Belieu.

*Lewis M. Schrawyer,* for respondent Blount.

SMITH, J.—The State of Washington sought review of a ruling of the Court of Appeals, Division Three, that the use of drawn guns and felony–stop procedures by police exceeded the permissible scope of a "Terry"[1] investigative stop. We find that the officers had sufficient information about the suspects upon which to base reasonable fears for their own safety. We reverse.

The single issue in this case is whether reasonable fears for their own safety justified the use of drawn guns by police officers for an investigative stop of four men in a car at night who were reasonably suspected by the officers of planning a burglary in an area where weapons had been stolen in a series of earlier burglaries.

On the evening of October 21, 1985, Stephen Duffy was at his home in Spokane on the east 2600 block of Heroy Avenue watching television. The lights in his house were dimmed. The blinds were drawn. From outside, it appeared

---

[1]*See Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

that the Duffy residence was unoccupied. At about 9:30 p.m. there was a loud knock on his door. He answered it. A bearded white male, about five foot seven, wearing a jacket and jeans, asked to use Mr. Duffy's telephone. The stranger said his automobile had broken down and that he wanted to call for assistance. Mr. Duffy saw another man waiting at the end of his walkway. He was suspicious because other houses in the neighborhood were "lit up like a Christmas tree." He wondered why these men had come to his house for help when his was the darkest house on the block. He sent them away.

Moments later, Mr. Duffy telephoned 911. He told the operator he thought the men were "casing" his house for burglary and explained the details of his encounter. He identified himself and gave the operator his telephone number and a description of the men.

Meanwhile, about a mile away, three officers of the Spokane Police Department were engaged in surveillance of a suspected burglary. Officers Richard J. Poole, Joel Fertakis and Larry Lindskog were all in unmarked cars and wearing plain clothes. They heard a report of the Duffy incident over the police radio, giving a description of the men suspected of casing houses for burglary. At 9:39 p.m. Officer Lindskog, who was in charge of the special surveillance group, dispatched Officer Poole, who arrived in the area of the Duffy residence at 9:46 p.m.

Officer Poole headed east on Heroy Avenue. In the area of the 2700–2800 block, he saw two men walking west on the north side of the street. One of them matched the description given on the radio. Officer Poole continued east in his automobile and took up a position on the next side street. From there he could observe the two men who were then walking away from him west on Heroy Avenue. He reported this information on the radio.

Shortly afterward, Officer Fertakis approached the area in his automobile heading south on Lacey Street. He saw two men walking north on Lacey from Heroy, one of whom matched the description broadcast earlier. Officer Fertakis

made a U–turn and pulled in behind a white Ford Torino parked on Lacey Street about 1½ car lengths from the intersection at Heroy. The men on the street had maintained eye contact with Officer Fertakis as he drove by. He watched them cross the street toward the white automobile. They continued to watch his vehicle. As they crossed in front of the Torino and looked back toward it, Fertakis parked behind it. As he did so, someone sitting in the driver's seat of the Torino slouched down. This caused the officer some concern. The two men on foot turned left, went north on Lacey, and turned right, disappearing around the corner on Hoffman Avenue.

By this time, approximately 9:50 p.m., Officer Lindskog had also arrived in the area in his automobile. He took up a position on the west side of Lacey at the intersection of Wellesley Avenue, looking south toward Hoffman and Heroy. He saw the two men turn the corner from Lacey onto Hoffman. He could not see the white Torino near Heroy, but was monitoring the radio. After hearing Fertakis' report about the Torino, Lindskog told him to leave his location. Officer Fertakis pulled past the Torino, drove up to the intersection of Hoffman, and turned east, attempting to follow the two men who had just gone around the corner. They had disappeared. The officer continued east on Hoffman. It was 9:51 p.m.

Officer Lindskog saw the two men running back from the area where they had just gone out of his line of sight on Hoffman. He reported this by radio. The men cut across a yard at the corner of Lacey and Hoffman, running hard in the direction of the white car. Officer Fertakis made a U–turn and headed back toward Lacey Street.

The white Torino started up Lacey toward Officer Lindskog in the dark with its lights off. The officer could see a passenger in the darkened car bent over or slouched down in the front seat doing something. As the automobile entered the intersection of Hoffman, its lights came on. Officer Fertakis, heading back toward that same intersection from the east, observed four people in the Torino.

Officers John C. Stanley and Donald Giese were in plain clothes driving an unmarked police car. Unlike the vehicles of Officers Lindskog, Poole and Fertakis, theirs was equipped with blue–and–red flashing lights behind the grille. They had been monitoring the radio transmissions. They approached Lacey from the west on Wellesley Avenue with the grille lights flashing. As they turned south on Lacey, Officer Lindskog pulled his automobile in front of the Torino, blocking its path.

Officer Lindskog got out of his vehicle, pointed his service revolver at the Torino, identified himself as a police officer, and ordered the men in the white Ford Torino to keep their hands in plain view. Officers Stanley and Giese also got out of their vehicle and drew their weapons. It was 9:55 p.m.

Officer Lindskog instructed the driver of the Torino, respondent Ronald M. Blount, to get out of the vehicle with his hands on his head and to back toward Officer Giese. As Blount was backing up, Officer Stanley observed what appeared to be a weapon on the driver's hip. Blount began to move his hand toward it. He was ordered to replace his hands behind his neck. Officer Giese frisked him and discovered a knife, referred to at trial as a "survival" knife. The officer then removed the weapon and handcuffed respondent Blount.

Officer Stanley had taken up a position behind a tree on the passenger side of the Torino. Officer Lindskog ordered the passenger, respondent Kevin R. Belieu, out of the car and ordered him to back toward Officer Stanley. When the officer frisked Belieu for weapons, he discovered some hard objects in Belieu's pocket and removed them for the officers' safety. A ring, proved at trial to have been stolen, fell to the ground. Officer Stanley handcuffed Belieu and placed him in a patrol car.

After Brian Anderson, riding in the right rear seat of the Torino, got out, Officer Stanley could see a rifle on the back seat. Officer Lindskog also observed this weapon from outside the vehicle after the fourth man, John Sweet, got out

from the passenger–side door. The butt of the rifle had been sawn off and appeared to be illegal. Lindskog directed that no one touch the weapon or the automobile. He then contacted the officers who had the four men in custody.

Respondent Donald Blount had been placed in the custody of Officer Gregory Harshman, who then gave "Miranda" warnings which Blount said he understood. It was 10:01 p.m.

At 10:05 p.m. Officer Lindskog heard respondent Blount consent to a search of the vehicle. He then checked beneath the driver's seat and noticed a protruding gun handle. He did not touch nor remove the gun at that time. Later it was identified as a .357 magnum revolver. He found another handgun under the passenger seat. It was a .38 caliber weapon. There was a quantity of trash and garbage under the front seats which would have prevented the weapons being passed from the back to the front. All the weapons were loaded. About 10 minutes after the initial stop, it was discovered that respondent Ronald Blount had an outstanding traffic warrant. He was then placed under arrest.

Brian Anderson initially gave a false name when questioned about his identity. It was later discovered that there was an outstanding felony escape warrant for him. At trial, he testified that he and the three others had committed a number of burglaries. He said the four men were looking for places to burglarize and that their plan was to find a vacant home. They were doing this when he and John Sweet approached the Duffy residence.

Respondent Kevin Belieu was on parole from, and had prior convictions for, second degree robbery and second degree assault.

At their separate trials in the Spokane County Superior Court, both Kevin Belieu and Ronald Blount made motions to suppress evidence obtained during the vehicle stop, contending the stop was unlawful. Both motions were denied.

Judge George T. Shields incorporated into his conclusions of law in respondent Belieu's case a statement that

"probable cause existed to stop the suspect vehicle and conduct a felony stop."

Judge Thomas E. Merryman, entering his findings on respondent Blount's motion, added that probable cause to arrest may have existed prior to the stop. This would, of course, render moot any further inquiry into the scope of the stop procedures. Nevertheless, he analyzed the stop as a "Terry" stop and concluded it was valid. He noted:

I think there were circumstances there that would justify the nature of the stop . . . This is not a case of one individual in a car or on the street who is stopped. This is a case of four individuals that are located in . . . a moving vehicle . . . When the decision to stop was made in the manner it was, Officer Lindskog did not know how much help he had . . . It seems to me that his experience and expertise in these areas would certainly justify his concern and his suspicions for the safety of his officers himself [*sic*] as well as the individuals in the car. I think, frankly, *for him to have simply pulled that car over and approached that car under those circumstances just would not show good sense. I think the potential for injury or death to some of the officers and perhaps the defendants as well simply was too great.*

(Italics ours.)

On February 3, 1986, Judge Shields entered a judgment on stipulated facts, finding respondent Kevin Belieu "guilty" of felon–in–possession of a handgun. On April 29, 1986, after a full trial of respondent Ronald Blount, Judge Merryman entered a judgment of "guilty" of second degree burglary and attempted burglary.

Both cases were appealed and consolidated in the Court of Appeals. The convictions were overturned in a 2–to–1 opinion filed March 22, 1988, reported as *State v. Belieu,* 50 Wn. App. 834, 751 P.2d 321 (1988).

The landmark case on the federal law of investigative stops is *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). *Terry* carved out an exception to the general rule under the fourth amendment to the United States Constitution that searches and seizures must be based on

probable cause. Under *Terry,* whether a particular investigative stop is permissible without probable cause to support a full arrest is determined by a 4–step inquiry:

> *Step 1:* Was there a "seizure" as that term was intended in the Fourth Amendment—that is, was there a forcible detention as opposed to, for example, a consensual encounter?

> *Step 2:* Did the seizing officer have a reasonable suspicion of criminal activity?

> *Step 3:* Did the seizure fall within the class of limited intrusions that can be justified without probable cause?

> *Step 4:* Did the governmental interest justify the scope of even the limited intrusion, in light of the particular circumstances of the case?

*See State v. Wheeler,* 108 Wn.2d 230, 244, 737 P.2d 1005 (1987) (Pearson, C.J., dissenting).

Steps 1 through 3 relate to the preliminary question, "Is this a *Terry* stop?," and step 4 then asks, "'Given that this type of seizure meets the minimum requirements for a *Terry* stop, *was this particular seizure a reasonable intrusion in light of the circumstances at the time*?'" *Wheeler,* at 245 (Pearson, C.J., dissenting). This type of "two prong" analytical approach was adopted by the Court of Appeals in this case. *Belieu,* at 839. The Court of Appeals then based its reversals solely on the second "prong," step 4 of the inquiry above, stating "we hold the full felony stop executed by [the] officers far exceeded the scope of a permissible investigatory stop." *Belieu,* at 839. Thus, this case does not present a question whether there was sufficient reasonable suspicion to justify the stop.

Further, this case does not present the question whether ordering the suspects out of their car converted the investigative stop into an arrest. An investigative stop is not transformed into an arrest merely because an officer orders a suspect out of a car. *State v. Thornton,* 41 Wn. App. 506, 705 P.2d 271, *review denied,* 104 Wn.2d 1022 (1985), citing *Pennsylvania v. Mimms,* 434 U.S. 106, 109–12, 54 L. Ed. 2d 331, 98 S. Ct. 330, 332–33 (1977); *United States v. White,*

648 F.2d 29, 36–40 (D.C. Cir.), *cert. denied,* 454 U.S. 924 (1981). "A police officer may order a driver who has been validly stopped to get out of his or her car, regardless of whether the driver is suspected of being armed or dangerous or whether the offense under investigation is a serious one." Utter, *Survey of Washington Search and Seizure Law: 1988 Update,* 11 U. Puget Sound L. Rev. 411, 527–28 (1988), citing *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 54 L. Ed. 2d 331, 335, 98 S. Ct. 330, 333 (1977) (intrusion de minimis, and risks confronting the officer substantial); and *State v. Kennedy,* 107 Wn.2d 1, 726 P.2d 445 (1986).

As events unfolded, the driver of the stopped vehicle, respondent Blount, was found to be armed immediately after the stop. Thus, the question is not presented whether the subsequent handcuffing and separation of the four men was a reasonable means of maintaining security. *See United States v. Taylor,* 716 F.2d 701, 708–09 (9th Cir. 1983). Rather, the single question here is whether the force used in effecting the stop itself converted an ostensible investigative stop into an arrest from its inception. That is, did the use of drawn weapons exceed the scope of a "Terry" stop under the circumstances of this case?

This court's leading case on the scope of investigative stops, interpreting *Terry,* is *State v. Williams,* 102 Wn.2d 733, 689 P.2d 1065 (1984). It is the authority upon which the Court of Appeals overturned the convictions in this case. *State v. Belieu,* 50 Wn. App. 834, 839, 751 P.2d 321 (1988).

Under *Williams,* a court must make several inquiries in evaluating investigative stops: (1) was the initial interference with the suspect's freedom of movement justified at its inception? and, (2) was it reasonably related in scope to the circumstances which justified the interference in the first place? *Williams,* at 739.

To justify an intrusion, a police officer must be able to point to "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Williams,* at 739 (quoting

*Terry v. Ohio,* 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)). The Court of Appeals assumed that in this case there was sufficient information leading the police officers to believe there was a substantial possibility of criminal activity to justify a "Terry" stop. *Belieu,* at 839.

As indicated in *Williams,* the United States Supreme Court has suggested three relevant factors in determining whether intrusion upon a suspect's liberty is so substantial that its reasonableness is dependent upon probable cause and hence cannot be supported by suspicion alone: (1) the purpose of the stop; (2) the amount of physical intrusion upon the suspect's liberty; and (3) the length of time the suspect is detained. *Williams,* at 740.

This case entails only one of the factors of that inquiry. The purpose of the stop was for investigation of attempted burglary. The 10–minute detention before the stop began to ripen into arrests was brief, compared to the 35–minute interval that appeared to "approach excessiveness" in *Williams,* at 741 n.4. We are concerned here only with the appropriateness of the display of force before respondent Blount was found to be armed and made a gesture interpreted as "going for his weapon." Compare *United States v. Greene,* 783 F.2d 1364 (9th Cir.) (officers drawing weapons after suspect in vehicle failed to comply with instructions to raise hands did not transform stop into arrest), *cert. denied,* 476 U.S. 1185 (1986); *United States v. Thompson,* 597 F.2d 187 (9th Cir. 1979) (handcuffs did not convert stop into arrest and were reasonably necessary when suspect reached for his pocket after being warned not to do so). *See also United States v. Jacobs,* 715 F.2d 1343 (9th Cir. 1983) (per curiam) (investigative stop did not become an arrest when deputy pointed his gun at defendant and ordered her to "prone out"). We agree that the frisking, handcuffing and separating of the occupants was clearly justified by the unfolding events. *See State v. Belieu,* 50 Wn. App. 834, 847, 751 P.2d 321 (1988) (Green, J., dissenting).

The majority of the Court of Appeals focused upon the amount of force used in making the stop. It held that the facts known and articulated by the police did not give rise to a reasonable belief that these defendants were armed and dangerous. *Belieu,* at 842. It was upon this holding that the force used was found to be excessive and upon this basis that the convictions were overturned.

In *Belieu,* the Court of Appeals compared the intrusiveness of this stop with that of *Williams* and found them remarkably similar. *Belieu,* at 840. If true, this would lead to a conclusion that the stop was, in effect, an arrest. However, the factors relating to the scope of intrusion that weighed against the police in *Williams* are distinguishable from a comparable list of factors in this case.

In *Williams* there were (1) no articulable reasons for believing that the defendant was dangerous; (2) no furtive gestures or violent responses by the defendant; and (3) no facts about the alleged crime to justify assuming the suspect was armed. The court concluded that "[t]he facts simply do not support an inference that petitioner was dangerous." *Williams,* at 740. In addition, the detention was not related to any investigation focused on the suspect.

In *Williams* the court acknowledged that under certain circumstances the combination of drawn guns, handcuffs and seclusion of defendants may be justified. But the necessary circumstances were found lacking in that case. *Williams,* at 740. Similarly, the Court of Appeals in this case held that "the facts known and articulated by the police officers here did not give rise to a reasonable belief these individuals, in this car, were armed and dangerous." *Belieu,* at 842. We disagree.

In this case the police were aware that weapons had been burglarized from residences in the area. The alleged crime was burglary or attempted burglary. The suspects had made several furtive gestures. These reasons were articulated by the police and constituted facts to justify an inference that the suspects were armed. The investigation was focused squarely upon these persons because of the earlier

citizen report and description. These facts are comparable, but not similar, to those in *Williams*.

The Court of Appeals in this case found "no case similar on its facts . . . in which a full felony stop, with guns drawn, followed by handcuffing and frisking the car's occupants, has been found less intrusive than an arrest." *Belieu*, at 841. Several cases from the United States Court of Appeals for the Ninth Circuit are then cited, including *United States v. Robertson*, 833 F.2d 777 (9th Cir. 1987); *Kraus v. County of Pierce*, 793 F.2d 1105 (9th Cir. 1986), *cert. denied*, 480 U.S. 932 (1987); *United States v. Ramos–Zaragosa*, 516 F.2d 141 (9th Cir. 1975); *United States v. Strickler*, 490 F.2d 378 (9th Cir. 1974). The court also cited *United States v. Vasquez*, 638 F.2d 507 (2d Cir. 1980), *cert. denied*, 454 U.S. 975 (1981). However, those cases do not provide authority for the proposition that the use of drawn guns and felony stop procedures went beyond the permissible scope of a "Terry" stop under the circumstances of this case. *Cf. United States v. Jones*, 759 F.2d 633 (8th Cir.) (officers approaching automobile with guns drawn did not convert an investigative stop into an arrest), *cert. denied*, 474 U.S. 837 (1985); *United States v. Taylor*, 716 F.2d 701 (9th Cir. 1983) (ordering suspect out of car at gunpoint, and forcing him to lie face down in a ditch for 3 to 5 minutes while he was frisked and handcuffed did not convert the stop into an arrest); *United States v. Bull*, 565 F.2d 869 (4th Cir. 1977) (use of a gun when accosting a suspect, standing alone, is not sufficient to convert an investigative stop into an arrest), *cert. denied*, 435 U.S. 946 (1978); compare *United States v. Delgadillo–Velasquez*, 856 F.2d 1292 (9th Cir. 1988) (use of drawn guns and order to "prone out" *combined with an announcement that the suspects were under arrest* is an arrest, not an investigative stop). *See also United States v. Buffington*, 815 F.2d 1292 (9th Cir. 1987); *United States v. Jacobs*, 715 F.2d 1343 (9th Cir. 1983). An investigative stop does not automatically become an arrest when an officer points a gun at a suspect. *United*

*States v. Serna–Barreto,* 842 F.2d 965 (7th Cir. 1988) (declining to follow *Strickler*).

There is no bright line standard for determining the degree of invasive force which may convert an investigative stop into an arrest. The standard is most frequently stated to be a function of the officers' reasonable fears for their own safety. This fear is reasonable if it is based on "particular facts" from which reasonable inferences of danger may be drawn. *Sibron v. New York,* 392 U.S. 40, 64, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1986). The investigative methods must be the least intrusive means reasonably available. *State v. Gonzales,* 46 Wn. App. 388, 394, 731 P.2d 1101 (1986), citing *Florida v. Royer,* 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). The force used should bear some reasonable proportionate relationship to the threat apprehended by the officers.

The other bases for distinguishing between a stop and an arrest are measured from the perspective of the person under "investigation." These are stated alternatively as the point at which the suspect's movement is completely restricted, *see, e.g., Strickler,* at 380, or the point at which an innocent person would reasonably believe that person was under arrest. *State v. Friederick,* 34 Wn. App. 537, 541, 663 P.2d 122 (1983) (quoting *State v. Stroud,* 30 Wn. App. 392, 395, 634 P.2d 316 (1981), *review denied,* 96 Wn.2d 1025 (1982)).

The "complete restriction" analysis has not always been applied on occasions when it would logically compel a conclusion that the stop in question was in fact an arrest. *See United States v. Scheiblauer,* 472 F.2d 297, 301 (9th Cir. 1973) (a permissible investigative stop may cause an innocent party to think that person is under arrest). The test may have been restated in *United States v. Patterson,* 648 F.2d 625, 634 (9th Cir. 1981) (an innocent person could not reasonably have assumed the person was being taken into custody indefinitely). *See also State v. Sweet,* 36 Wn. App. 377, 675 P.2d 1236 (1984) (reasonable suspicion was sufficient to justify transportation of the suspect to a crime

scene), *aff'd on remand,* 44 Wn. App. 226, 721 P.2d 560, *review denied,* 107 Wn.2d 1001 (1986); *State v. Walker,* 24 Wn. App. 823, 604 P.2d 514 (1979) (detention of suspect in police car while victim came to identify him was reasonable); *State v. Serrano,* 14 Wn. App. 462, 544 P.2d 101 (1975) (temporary detention justifiable under suspicious circumstances).

It is not practical to prescribe an objective formula for police conduct to determine when an investigative stop becomes an arrest. There are only two places pertinent to this case for drawing a firm line where force will convert a stop into an arrest: (1) when a weapon is drawn by police; or, (2) when a weapon is pointed at a suspect by police. Courts generally have not drawn such lines, preferring to make fact–specific determinations of the reasonableness of force on a case–by–case basis. *See United States v. Ceballos,* 654 F.2d 177, 182–83 nn.7, 10 (2d Cir. 1981). No hard and fast rule governs the display of weapons in an investigatory stop. Rather, the court must look at the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day and the reaction of the suspect to the police, all of which bear on the issue of reasonableness. *State v. Thornton,* 41 Wn. App. 506, 512 n.1, 705 P.2d 271, *review denied,* 104 Wn.2d 1022 (1985).

The Court of Appeals in this case emphasized it would not require police officers to provide easy targets for dangerous persons, acknowledging that "[w]hen officers have a reasonable belief a car's occupants are armed and dangerous, they may make a stop at gunpoint." *Belieu,* at 842, citing *United States v. Ceballos,* 654 F.2d 177, 182–84 (2d Cir. 1981); *United States v. Beck,* 598 F.2d 497 (9th Cir. 1979); *United States v. Ramos–Zaragosa,* 516 F.2d 141 (9th Cir. 1975); *State v. Williams,* 102 Wn.2d 733, 689 P.2d 1065 (1984); *State v. Samsel,* 39 Wn. App. 564, 573, 694 P.2d 670 (1985).

This is in alignment with the American Law Institute's Model Code of Pre–Arraignment Procedure, which states:

[T]he use of such force, other than deadly force, as is reasonably necessary to stop any person or vehicle, or to cause any person to remain in the officer's company [is authorized]. Although it is not envisaged that force would have to be used frequently, it would be frustrating and humiliating to the officer to grant him an authority to order persons to stop, and then ask him to stand by while his order is flouted . . .

There is ground for concern that encounters in which moderate force is used may escalate into deadly force; but this possibility does not seem so serious as to warrant rejecting an authority which is essential to a coherent scheme of police powers.

(Footnote omitted.) Model Code of Pre–Arraignment Procedure § 110.2, commentary, at 284–85 (1975).[2]

What remains is a determination of the reasonableness of the officers' fears. The *Terry* court, in discussing the appropriateness of a frisk, contemplated the use of force when "justified," saying:

When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Terry,* at 24.

Thus, the issue is further refined to determine how much justification officers must have in fearing for their personal safety when confronting unknown persons in an emergent investigative stop. On this question, courts are reluctant to substitute their judgment for that of police officers in the field. "A founded suspicion is all that is necessary, *some*

---

[2]The section is cross–referenced to the Model Penal Code, where "deadly force" specifically excludes the mere drawing or pointing of a weapon by police. *See* Model Penal Code § 3.10(2) (1985) (a threat to cause death or serious bodily injury, by the production of a weapon or otherwise, so long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute deadly force).

*basis from which the court can determine that the detention was not arbitrary or harassing."* (Italics ours.) *Wilson v. Porter,* 361 F.2d 412, 415 (9th Cir. 1966).[3]

The question whether the use of drawn guns is justified in effecting a stop may be analogized to the standard for frisking one who is the subject of a "Terry" stop. That standard is that the "officer need not be absolutely certain that the individual is armed; *the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."* (Italics ours.) *Terry v. Ohio,* 392 U.S. 1, 27, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In determining whether the officer acted reasonably in such circumstances, due weight must be given, not to the officer's inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences the officer is entitled to draw from the facts in light of the officer's own experience. *Terry,* at 27. A frisk must not be undertaken as a result of the product of the officer's "volatile or inventive imagination" or "simply as an act of harassment;" rather, the record must evidence "the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." *Terry,* at 28.

The police officers in this case had reason to believe the suspects might be armed because they were suspected of burglary or attempted burglary in an area where numerous

---

[3]This level of scrutiny is reflected in rulings on other procedures used in investigative stops as well. The Court of Appeals, Division Two, has said:

"The Constitution does not require an officer to wager his physical safety against the odds that a suspected assailant is actually unarmed."

We cannot in good conscience sit in the calm, reflective atmosphere of an appellate court and conclude, in an act of pointless hairsplitting, that a pat-down of the defendant incident to the stop would have been constitutional but the officer is legally precluded from attempting to seize a clenched or concealed hand to determine whether it might hold a weapon.

(Citation omitted.) *State v. Serrano,* 14 Wn. App. 462, 469–70, 544 P.2d 101 (1975).

burglaries had resulted in the theft of weapons. While burglary may be a crime of stealth, as opposed to violence, it does require specific intent, and is not comparable to a negligent or reckless act. The officers had no idea whom they were stopping, where the suspects lived, or whether they would remain in the jurisdiction. It is uncertain whether the officers even knew how many persons they were stopping, other than that there were at least three. Whether the mere pace of the rapidly unfolding events of that night was sufficiently "exigent" to justify the felony stop is a question we do not decide. But there was not unlimited time available to accomplish the stop.

A generalized fear that persons involved in a particular type of crime, *e.g.,* narcotics traffic, may be armed or dangerous because criminals of that type frequently are armed is insufficient to support a maximum use of force. *United States v. Ceballos,* 654 F.2d 177 (2d Cir. 1981). As that court noted, if generalization alone was sufficient, any "suspect, even if unknown to the agents and giving no indication that force is necessary, could be faced with a 'maximal intrusion' based on mere reasonable suspicion." *Ceballos,* at 184.

In contrast, a specific fear that particular persons may be armed because of the nature of the criminal activity of which they are suspected has been found sufficient to support the use of drawn weapons. *See State v. Thornton,* 41 Wn. App. 506, 507, 705 P.2d 271, *review denied,* 104 Wn.2d 1022 (1985). There, suspicion of armed robbery gave a reasonable inference that the detainees were armed, and the investigative stop was not so disproportionately invasive as to be an arrest. Thus it was permissible to stop the suspects and order them out of their car at gunpoint without probable cause sufficient for an arrest.

The facts of this case support specific fear on the officers' part. Because the occupants of the white Torino were suspected of burglary or attempted burglary in an area where numerous burglaries had resulted in weapons being stolen, there was a reasonable inference that they might have been

armed. Generally, a suspicion of burglary by itself would not support an inference that a suspect was armed. *But see State v. Harvey,* 41 Wn. App. 870, 875, 707 P.2d 146 (1985) (officer justified in making a protective search of a burglary suspect on the ground that it is well known that burglars often carry weapons).

There was no opportunity to observe the suspects for a protracted period to evaluate their potential dangerousness before an investigative stop was justified. There was limited opportunity even to see clearly how many persons occupied the suspect vehicle. Under these circumstances "[t]he risk of harm to both the police and the [suspects] is minimized if the officers routinely exercise unquestioned command of the situation." *Michigan v. Summers,* 452 U.S. 692, 702–03, 69 L. Ed. 2d 340, 350, 101 S. Ct. 2587 (1981), citing 2 W. LaFave, *Search and Seizure* § 4.9, at 150–51 (1978). "The means of investigation need not be the least intrusive available, provided the police do not act unreasonably 'in failing to recognize or to pursue' a less intrusive alternative." Utter, *Survey of Washington Search and Seizure Law: 1988 Update,* 11 U. Puget Sound L. Rev. 411, 521 (1988), citing *United States v. Sharpe,* 470 U.S. 675, 677, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985). Here, we cannot say the officers acted unreasonably in failing to pursue a less intrusive means of accomplishing the stop while simultaneously addressing their legitimate concerns for safety.

Finally, pointing weapons at suspects reasonably believed to be dangerous does not convert an investigative stop into an arrest. The United States Court of Appeals for the Eleventh Circuit considered a case with facts remarkably parallel to those in this case. In *United States v. Merritt,* 695 F.2d 1263 (10th Cir. 1982), *cert. denied,* 461 U.S. 916 (1983), the occupants of a pickup truck slouched down while parked behind an unmarked police vehicle. This was in a residential neighborhood late at night. Police officers pointed two shotguns at the suspects. The police ordered

them out of the truck. Soon 6 or 7 police cruisers and 12 to 15 police surrounded the suspects. A revolver was found protruding from beneath the driver's seat. The police officers were searching for a murder suspect reported to be armed. *The application of all of this force did not exceed the permissible scope of an investigative stop.* The court observed that:

> "[a]s a society, we routinely expect police officers to risk their lives in apprehending dangerous people. We should not bicker if in bringing potentially dangerous situations under control they issue commands and take precautions which reasonable men are warranted in taking."

*Merritt,* at 1274, quoting *Bailey v. United States,* 389 F.2d 305, 315 (D.C. Cir. 1967). The court also noted that "the continued use of guns to secure their detention [of the defendants] was justified at least until the protective search of the truck was completed. After the search uncovered a weapon under the driver's seat . . . the police would of course be entitled to continue detaining him at gunpoint." *Merritt,* at 1274.

We conclude that under the particular circumstances of this case the officers had sufficient specific information about the men in the Ford Torino upon which to base reasonable fears for their own safety that justified the use of drawn weapons in accomplishing the initial phase of an investigative stop. Further, we conclude that there is sufficient basis in the record from which the trial courts could conclude that the detention was neither arbitrary nor harassing.

We need not consider whether the stop itself was justified because the Court of Appeals made the assumption that it was. We also need not consider the question whether the combined use of drawn weapons, frisking and handcuffing exceeded the permissible scope of a "Terry" stop because these were justified by events occurring after the initial stop.

The ruling of the Court of Appeals is therefore reversed and the verdicts of the trial courts are reinstated.

CALLOW, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, PEARSON, and ANDERSEN, JJ., concur.
DURHAM, J., concurs in the result.