FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 MAR -4 AM 10: 27



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | ) | |
|---|---|---|
| | ) | No. 68005-6-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| D.B.-H., B.D. 10/07/95, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 4, 2013 |
| | ) | |

BECKER, J. — Police officers do not exceed the scope of a legitimate investigatory detention by using a show of force or protective measures where there are grounds to believe public safety or the officers' personal safety is in jeopardy. Here, because specific articulable facts supported an objectively reasonable belief that D.B.-H., a passenger on a crowded King County Metro bus, could be unlawfully armed and dangerous, the police were justified in approaching him with a drawn weapon, placing him in handcuffs, and escorting him from the bus in order to investigate. The juvenile court properly denied the motion to suppress. We affirm D.B.-H.'s conviction for unlawful possession of a firearm in the first degree.

FACTS

On July 8, 2011, the City of Federal Way hosted its annual summer festival, Cornucopia Days. Extra police officers were on duty for the event. Federal Way police officer Chris Walker was stationed at the Kent Station Transit Center near the festival grounds. Officer Walker has 20 years' experience in law enforcement, is a firearms instructor, and has carried a concealed weapon for 20 years.

At around 9:00 p.m., Officer Walker saw D.B.-H. walking toward him. The officer noticed D.B.-H. because, despite the warm summer weather, he was wearing a heavy black coat. His right arm was swinging normally, but his left arm was pressed against his side, and the officer was able to see the outline of a six-inch long rigid object at the bottom of his left jacket pocket. According to Officer Walker, the object appeared to be a firearm. The officer observed that D.B.-H. was "obviously" under 21, the legal age in Washington to obtain a concealed weapons permit.[1] D.B.-H. walked past the officer, started to jaywalk along with four or five other young males, but then looked back at Officer Walker and stepped back onto the curb. He then crossed the street at a cross walk, rejoined the group of teenagers, and disappeared from view.

About 20 minutes later, Officer Walker saw D.B.-H. again back at the transit center. Officer Walker made eye contact with D.B.-H. and tried to get closer to him, but before the officer could contact him, D.B.-H. boarded a crowded bus. Officer Walker recognized an undercover King County detective

---

[1] D.B.-H. was 15 at the time.

2

boarding the same bus. Officer Walker then approached a King County Sheriff's Office supervisor who was standing nearby and told her what he had seen.

In fact, two undercover detectives, Andrew Schwab and Steve Johnson, were on the bus with D.B-H. Shortly after the bus left the transit center, a supervisor called Detective Schwab to advise him of Officer Walker's belief that D.B.-H., who was sitting nearby and appeared to be with a group of friends at the back of the bus, was armed with a handgun. Detective Schwab decided to remain on the bus when his partner, Detective Johnson, got off at a predetermined bus stop. When Detective Johnson called to find out why he stayed on the bus, Detective Schwab informed him in coded language about the concern that D.B.-H. was illegally carrying a gun.

Detective Johnson then coordinated a plan with other officers to remove D.B.-H. from the bus to investigate. First, another undercover officer boarded the bus and asked the driver to hold the bus at the next stop and open only the back doors. Then at the next stop, four officers led by Detective Johnson and wearing police department protective vests got on the bus. Detective Johnson had his weapon drawn and pointed at D.B.-H. He told D.B.-H. to place his hands on his head, stand, and turn around. After D.B.-H. complied, Detective Johnson replaced his gun in its holster, put handcuffs on D.B.-H., and led him off the bus. The other officers remained on the bus.

Once off the bus, the detective introduced himself to D.B.-H. and explained why he was removed from the bus. He asked D.B.-H. if he was carrying a gun, and D.B.-H. replied that he was not. The detective then asked

3

D.B.-H. if he could search his pockets, and D.B.-H. said he could. The detective then clarified that he was asking not merely to pat down outside his clothing, but to put his hands inside the pockets of D.B.-H.'s clothing. D.B.-H. stated "go ahead. You're going to do it anyway." Inside the pocket of shorts D.B.-H. was wearing underneath his trousers, the detective found a fully loaded semiautomatic handgun.

The State charged D.B.-H. with unlawful possession of a firearm in the first degree. D.B.-H. moved to suppress the firearm, arguing that the use of force converted the investigative detention into an arrest without probable cause. D.B.-H. also argued that his consent to search his person for weapons was not voluntary because he was not advised that he could refuse and because the environment was coercive.

The trial court denied the motion. The court concluded that "Officer Walker, and by extension his fellow officers, had reasonable, articulable suspicion to believe" that D.B.-H. was "illegally concealing a firearm" and that the "nature and the scope of the investigatory stop conducted by King County Sheriff's deputies was reasonable and justified given the nature of the suspected crime and the potential danger to both deputies and the Respondent, as well as other Metro passengers." The court further concluded that "considering the totality of the circumstances, the Respondent's consent to search inside of his pockets was not the result of duress or coercion but rather was given freely and voluntarily." The court found D.B.-H. guilty as charged and imposed a standard range disposition.

## USE OF FORCE IN INVESTIGATORY DETENTION

D.B.-H. argues that the trial court improperly denied his motion to suppress because the police used excessive force in conducting the investigatory detention.

Upon a trial court's ruling on a suppression motion, we review challenged findings of fact for substantial evidence, challenged conclusions of law de novo, and determine whether the findings support the conclusions. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). D.B.-H. assigns error to only one of the trial court's factual findings, claiming that the evidence does not support the court's finding that the object in his coat pocket caused the pocket to "sag." But D.B.-H. relegates this argument to a footnote and, in any event, his own proposed findings included this language. He has waived the claim of error. See RAP 2.5(a); RAP 10.3(a). Because D.B.-H. does not otherwise challenge the court's factual findings, they are verities on appeal. See State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005).

An investigative detention, or Terry stop, occurs when the police briefly seize an individual for questioning based on "specific and articulable," objective facts that give rise to a reasonable suspicion that the individual has been or is about to be involved in a crime. Terry v. Ohio, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); State v. Armenta, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997). Where, as here, the suspected crime is a firearm violation, an officer need not be absolutely certain that a suspect is armed. Terry, 392 U.S. at 21-24.

5

"'A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing.'" State v. Belieu, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989) (emphasis omitted), quoting Wilson v. Porter, 361 F.2d 412, 415 (9th Cir. 1966).

While not typically part of a Terry stop, police may use intrusive measures such as drawn weapons and handcuffs in order to accomplish the investigatory detention under some circumstances. State v. Williams, 102 Wn.2d 733, 740 n.2, 689 P.2d 1065 (1984); State v. Mitchell, 80 Wn. App. 143, 146, 906 P.2d 1013 (1995), review denied, 129 Wn.2d 1019 (1996). Doing so does not exceed the scope of a lawful detention if a reasonable person in the same circumstances would believe he or others are in danger. Belieu, 112 Wn.2d at 602. No hard and fast rule governs the display or use of force; but several facts may bear on the issue of reasonableness, including the nature of the crime under investigation, the degree of suspicion, the physical location of the stop, the time of day, and the reaction of the suspect to the police. Belieu, 112 Wn.2d at 600. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

D.B.-H. argues that the intrusive measures used by law enforcement to detain him for investigation were unwarranted because he was in a "safe, well-lit Metro bus filled with passengers," made no furtive movements when the officers

6

approached him, and by all accounts, was cooperative during the detention.[2]

D.B.-H. contrasts the circumstances here with those present in State v. Belieu. In Belieu, police officers received a citizen's report describing men he believed were casing his home for burglary in an area where weapons had been stolen in a series of previous burglaries. Belieu, 112 Wn.2d at 588-89. When the officers arrived in the neighborhood, they observed two men, one of whom matched one of the descriptions of the suspects. The men walked toward a parked, occupied vehicle, then turned in a different direction. Belieu, 112 Wn.2d at 589-90. A few minutes later, the men were spotted running back toward the parked car. Belieu, 112 Wn.2d at 590. Police officers had observed occupants of the car make furtive movements. Belieu, 112 Wn.2d at 590. When the car started down the street, the officers stopped the vehicle with weapons drawn. Belieu, 112 Wn.2d at 590-91. The officers ordered the suspects out of the car, handcuffed, and placed them in patrol cars. Belieu, 112 Wn.2d at 591. The court concluded that the officers had sufficient information upon which to base reasonable fears for their own safety, justifying the use of drawn weapons. Belieu, 112 Wn.2d at 605.

The safety considerations presented here were entirely different, but no less serious, than those presented in Belieu. And nothing in Belieu suggests that the use of a drawn weapon and handcuffs to accomplish the detention of D.B.-H. was unreasonable. The facts in Belieu supported a reasonable inference that the suspects might be armed because weapons were stolen in previous burglaries in the area and occupants of the car made some suspicious movements in view of

---

[2] Appellant's Brief at 13.

7

police. The facts here even more strongly supported the inference that D.B.-H. might be armed based on Officer Walker's visual observation 20 minutes earlier of what appeared to be a gun in his pocket. The testimony established that the police decided that intrusive measures were necessary because they were investigating a crime involving a weapon, and D.B.-H. was on a crowded public bus and appeared to be surrounded by a group of friends. We are, and should be, reluctant to second guess the police officers' determination in the field of how to safely detain a potentially armed suspect. See Belieu, 112 Wn.2d at 601.

D.B.-H. also relies upon State v. Smith, 67 Wn. App. 81, 834 P.2d 26 (1992), aff'd, 123 Wn.2d 51, 864 P.2d 1371 (1993), to argue that even if the circumstances justified approaching him with a drawn weapon, when the police used handcuffs and escorted him from the bus, he was effectively under arrest. In Smith, a police officer stopped the car of a burglary suspect. As the officer approached the vehicle with a drawn weapon, he could see televisions and other electronics in the car. The officer handcuffed the suspect, placed him on the ground and advised him of his Miranda[3] rights. This court determined that "by the time Smith was lying handcuffed on the ground, and being read his Miranda rights, an arrest had occurred" and probable cause supported the arrest. Smith, 67 Wn. App. at 88-89. Smith does not stand for the proposition that the use of handcuffs transform a detention into an arrest. In Smith, there were simply no facts to suggest there was a basis to believe that the suspect was armed or that

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the forceful measures were employed to accomplish an investigatory detention. In contrast, the record here establishes that D.B.-H. was placed in handcuffs so that the police could safely remove him from the crowded bus and investigate the suspected crime. The trial court's findings support its conclusion that the force used in conducting the investigatory stop was justified by the circumstances.

## CONSENT

Even if his detention were lawful, D.B.-H. argues that the firearm should have been suppressed because he did not voluntarily consent to be searched.

Whether consent was voluntary is a question of fact to be determined from the totality of the circumstances. State v. O'Neill, 148 Wn.2d 564, 588, 62 P.3d 489 (2003). No single factor is dispositive, but relevant factors include (1) whether Miranda warnings, if applicable, were given prior to consent, (2) the education and intelligence of the consenting person, and (3) whether the consenting person was advised that he or she could refuse to consent. State v. Reichenbach, 153 Wn.2d 126, 132, 101 P.3d 80 (2004); State v. Shoemaker, 85 Wn.2d 207, 212, 533 P.2d 123 (1975). The court may also weigh express or implied claims of police authority to search, previous illegal actions of the police, the defendant's cooperation, and police deception as to identity or purpose. Reichenbach, 153 Wn.2d at 132.

D.B.-H. identifies several factors weighing against a finding of voluntariness: his age at the time (15), the failure to advise him of his Miranda rights before requesting to search, and failure to inform him of his right to refuse

consent. But despite D.B.-H.'s youth, the evidence established that it was not his first encounter with law enforcement, and nothing in the record suggests that he lacked the intelligence or sophistication to understand that he could refuse consent. And while both the express advisement of the right to refuse consent and <u>Miranda</u> rights are relevant, neither is a prerequisite to finding voluntary consent. <u>O'Neill</u>, 148 Wn.2d at 588; <u>State v. Lyons</u>, 76 Wn.2d 343, 345, 458 P.2d 30 (1969); <u>State v. Flowers</u>, 57 Wn. App. 636, 645-46, 789 P.2d 333, <u>review denied</u>, 115 Wn.2d 1009 (1990). There is nothing, including D.B.-H.'s own testimony, to indicate that he was coerced or deceived into giving his consent. D.B.-H. was cooperating with the police. After he had already agreed to be searched, Detective Johnson asked a second time, to ensure that D.B.-H. understood the scope of the request. This clarification implicitly acknowledged his right to refuse. In sum, we conclude that the totality of the circumstances support the juvenile court's conclusion that the State met its burden to prove that D.B.-H. voluntarily consented to the search.

Affirmed.

Becker, J.

WE CONCUR:

Spearman, A.C.J.

Jam, J.

10