2015 JAN 20 AM 9: 41


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70929-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WYATT JAMES HENDERSON, | ) | |
| DOB 10/16/95, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: January 20, 2015 |
| | ) | |

VERELLEN, J. — Wyatt Henderson appeals from his juvenile adjudication for two counts of Violation of the Uniform Controlled Substances Act, chapter 69.50 RCW. He argues the trial court erred in denying his motion to suppress evidence, contending that he was subject to an unlawful seizure and search. Because the officer had specific and articulable facts that criminal conduct had occurred or was about to occur and had a reasonable belief that Henderson might be armed and presently dangerous, we affirm.

## FACTS

On the afternoon of July 2, 2011, Seattle Police Officer Christopher Brownlee was in uniform and patrolling Cal Anderson Park on his bicycle. Brownlee has extensive training and experience recognizing street level drug sales, including buying drugs as an undercover officer. Because the park was known to officers to be a "hotspot" of criminal activity, including sales of heroin and methamphetamines, Brownlee was routinely deployed "to do proactive enforcement to actively seek out

crimes as they are occurring."[1] The park spans two city blocks and contains tennis courts, soccer fields, a playground and a wading pool, but the northwest corner of the park is largely empty and secluded. Brownlee identified this northwest corner as one of the areas with the highest amount of criminal activity.

As Brownlee rode into the northwest corner, he saw two males, Henderson and Peter Hakala, standing very close together, face-to-face, slightly offset from each other, with their hands down close to their waistbands. According to Brownlee, during a hand-to-hand drug transaction, the buyer and seller typically stand "face-to-face and in close proximity so that a casual passerby could not see what was actually transpiring."[2] Brownlee saw the tip of what he believed to be a plastic baggie in Hakala's left hand, and was aware that street-level narcotics are often packaged in plastic baggies. Based on his training and experience, Brownlee believed that Henderson and Hakala were about to engage in a hand-to-hand drug transaction. As Brownlee rode closer, Hakala caught sight of him. Hakala's eyes widened and "he kind of got a 'darn it' look on his face."[3] Henderson and Hakala immediately turned their bodies away from Brownlee and obscured their hands.

Brownlee approached the males, saying, "Hey, what are you doing?"[4] Henderson responded that he was "hanging out" and that Hakala was telling him to "stay away from tweakers."[5] Because Henderson appeared to be a juvenile, Brownlee

---

[1] Report of Proceedings (RP) (Sept. 10, 2013) at 8-9.

[2] Id. at 15.

[3] Id. at 17.

[4] Id. at 27.

[5] Id.

asked his name and age. Henderson responded that his name was Tyler J. Hanson, that he was 15 years old and from Stanwood. Brownlee knew most of the homeless youth that frequented the park and did not recognize Henderson Suspecting that Henderson was a runaway, Brownlee decided to have dispatchers run the name and date of birth Henderson gave him through a database to determine if he had been reported missing. Brownlee typically received a result in less than two minutes.

As Brownlee used his radio to contact dispatch, Henderson began to shuffle his feet back and forth and cast his eyes about from left to right. In Brownlee's experience, these movements can be indicators of an impending attack. Brownlee asked Henderson to stop moving around, and Henderson complied. Henderson then put his hands underneath his shirt. Brownlee again ordered Henderson to stop moving. Brownlee then noticed that Henderson had the word "Peace" and a phone number written in marker on his arm. Brownlee knew an individual with the street name of Peace as a methamphetamine dealer who had been involved in a ring of burglaries. Brownlee asked Henderson, "All right, so what kind of drugs are you using now?"[6] Henderson admitted that he had used heroin that morning. Because Brownlee had previously had drug users brandish needles at him as a makeshift weapon, Brownlee asked Henderson if he had any needles on him. Henderson stated that he was not sure.

Based on Henderson's body posturing, body movements, and the possibility that Henderson had needles on his person, Brownlee proceeded to pat Henderson down for weapons. Brownlee felt a bulge in Henderson's pocket and asked if it was a wallet.

---

[6] Id. at 36.

Henderson responded that it was. Because Brownlee had not yet heard back from dispatch, he suspected that Henderson had given him a false name. Brownlee asked if he could remove Henderson's wallet from his pocket and Henderson agreed. Brownlee saw what appeared to be an identification card sticking out of the wallet. He asked Henderson if he could take it out of the wallet, and Henderson responded, "I would rather you didn't."[7] Brownlee said, "You lied to me about your name, didn't you?"[8] Henderson admitted that he had lied and that he had two outstanding warrants. Brownlee placed Henderson under arrest. Brownlee verified the warrants and read Henderson his Miranda rights.[9] Brownlee searched Henderson and found a methamphetamine pipe. During a subsequent search of Henderson's backpack, Brownlee also found heroin, several used syringes, and paraphernalia used to cook heroin.

The State charged Henderson with two counts of Violation of the Uniform Controlled Substances Act, RCW 69.50.4013. Henderson moved to suppress the statements and physical evidence obtained following his seizure. After a CrR 3.6 hearing, the trial court denied the motion and found that the seizure, protective frisk, and search of Henderson's backpack were lawful. Following a bench trial on stipulated facts, the trial court found Henderson guilty as charged. Henderson appeals.

## DISCUSSION

Henderson contends that the trial erred by denying his motion to suppress because the seizure and the subsequent protective frisk were unlawful. We review a

---

[7] Id. at 42.

[8] Id.

[9] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

trial court's ruling on a motion to suppress to determine whether substantial evidence supports the trial court's factual findings and whether its factual findings support its conclusions of law.[10] "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'"[11] Unchallenged findings of fact are verities on appeal.[12] We review conclusions of law de novo.[13]

<em>Seizure</em>

A seizure occurs when, "considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe he or she is free to leave or decline a request due to an officer's use of force or display of authority."[14] This is an objective standard that looks to the law enforcement officer's actions and asks whether a reasonable person in the individual's position would feel he or she was being detained.[15]

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution, a warrantless seizure is considered per se unconstitutional.[16] If a seizure is unlawful, the subsequent search and fruits of that

---

[10] State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009).

[11] Id. (quoting State v. Reid, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)).

[12] State v. Valdez, 167 Wn.2d 761, 767, 224 P.3d 751 (2009). Henderson challenges only Finding of Fact 14, which reads: "At this point, [when Brownlee decided to check Henderson's name in the computer database], Henderson was free to end their conversation and could have walked away." Clerk's Papers at 63.

[13] Garvin, 166 Wn.2d at 249.

[14] State v. Rankin, 151 Wn.2d 689, 695, 92 P.3d 202 (2004).

[15] Id.

[16] Id.

search are inadmissible.[17] However, officers may conduct a brief investigatory detention of a person, commonly called a Terry[18] stop, absent a warrant.[19] The officer must have "a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime."[20] "A reasonable, articulable suspicion means that there 'is a substantial possibility that criminal conduct has occurred or is about to occur.'"[21] We determine the reasonableness of the officer's suspicion based on the totality of the circumstances.[22] In reviewing those circumstances, we may consider such factors as the officer's training and experience, the location of the stop, and the conduct of the person detained.[23]

Here, the unchallenged findings of fact support the trial court's denial of Henderson's motion to suppress.[24] Henderson was in an isolated corner of Cal Anderson Park, which was known for a high incidence of narcotics use and delivery. Henderson and Hakala were standing face-to-face with their hands near their waists, a

---

[17] State v. Kennedy, 107 Wn.2d 1, 4, 726 P.2d 445 (1986).

[18] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[19] State v. Acrey, 148 Wn.2d 738, 746-47, 64 P.3d 594 (2003).

[20] Id. at 747.

[21] State v. Snapp, 174 Wn.2d 177, 197-98, 275 P.3d 289 (2012) (quoting Kennedy, 107 Wn.2d at 6).

[22] Id. at 198.

[23] State v. Glover, 116 Wn.2d 509, 514, 806 P.2d 760 (1991).

[24] The trial court concluded that up until the point where Brownlee contacted dispatch with Henderson's name and date of birth to determine if he was a runaway, Brownlee and Henderson's interaction constituted a "social contact," not a seizure. However, Henderson argues, and the State agrees, that Henderson was seized once Brownlee approached and asked, "What are you doing?" We need not address this issue because Brownlee had a reasonable, articulable suspicion to conduct a Terry stop at that point. We may affirm the denial of a suppression motion on any ground that is supported by the record. State v. Avery, 103 Wn. App. 527, 537, 13 P.3d 226 (2000).

posture typically used in hand-to-hand drug transactions to conceal the exchange from passers-by. Brownlee saw the tip of a plastic baggie, commonly used to package drugs, in Hakala's hand. As Brownlee approached, Hakala appeared startled, and both Henderson and Hakala turned away to hide their hands. The totality of the circumstances, combined with Brownlee's training and experience, gave rise to a reasonable suspicion that Henderson was about to buy or sell drugs, thereby justifying a Terry stop.

Henderson argues that this case is similar to State v. Gatewood,[25] State v. Doughty[26] and State v. Richardson,[27] three cases in which a defendant's actions were deemed insufficient to justify a Terry stop. None of these cases are comparable.

In Gatewood, officers on patrol drove by a bus shelter where the defendant was sitting. The defendant's eyes widened and he twisted his body as though to hide something. He left the bus shelter and jaywalked across the street, where the officers stopped him.[28] The court held that "[s]tartled reactions to seeing the police do not amount to reasonable suspicion."[29] In Doughty, an officer saw the defendant approach and leave a suspected drug house late at night.[30] The court noted that a defendant's mere presence in a high crime area, late at night, did not provide the legal basis for a Terry stop.[31] In Richardson, officers were patrolling an area late at night known for high

---

[25] 163 Wn.2d 534, 182 P.3d 426 (2008).

[26] 170 Wn.2d 57, 239 P.3d 573 (2010).

[27] 64 Wn. App. 693, 825 P.2d 754 (1992).

[28] Gatewood, 163 Wn.2d at 537.

[29] Id. at 540.

[30] Doughty, 170 Wn.2d at 59-60.

[31] Id. at 62.

drug activity, when they observed a man engaging in suspicious behavior: approaching cars to talk to their occupants, then walking away when officers approached.[32] The officers later saw the man with the defendant.[33] The court held "an individual's mere proximity to others independently suspected of criminal activity" does not justify an investigative stop.[34]

But here, Brownlee did not stop Henderson based solely on a nervous expression, as in Gatewood, on his presence in a high-crime area, as in Doughty, or for his proximity to Hakala, as in Richardson. Brownlee stopped Henderson because the totality of those circumstances supported Brownlee's reasonable suspicion. The stop was not unlawful.

### Protective Frisk

As part of a Terry stop, an officer may conduct a protective frisk for weapons when the officer has a reasonable concern for his safety.[35] A reasonable safety concern exists "when an officer can point to 'specific and articulable facts' which create an objectively reasonable belief that a suspect is 'armed and presently dangerous.'"[36] "'[C]ourts are reluctant to substitute their judgment for that of police officers in the field. A founded suspicion is all that is necessary, some basis from which the court can determine that the [frisk] was not arbitrary or harassing.'"[37] We must consider the

---

[32] Richardson, 64 Wn. App. at 694.

[33] Id. at 694-95.

[34] Id. at 697.

[35] State v. Collins, 121 Wn.2d 168, 173, 847 P.2d 919 (1993).

[36] Id. (quoting Terry, 392 U.S. at 21, 24).

[37] Id. (emphasis omitted) (alterations in original) (internal quotation marks omitted) (quoting State v. Belieu, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989)).

entirety of the circumstances in determining the validity of a protective frisk.[38]

The unchallenged findings of fact support the trial court's conclusion that the frisk was lawful. As Brownlee talked to Henderson, Henderson shuffled his feet, darted his eyes around, and reached under his shirt. Brownlee was concerned that these movements could signify that Henderson was preparing to access a weapon to attack him. Henderson admitted that he had used heroin that morning. When Brownlee asked Henderson if he had needles on him, Henderson stated he was not sure. Brownlee had experience with drug users brandishing needles and other drug paraphernalia at him as a weapon. These were specific and articulable facts that supported a founded suspicion that Henderson may be armed and dangerous. Under the circumstances, Brownlee's protective frisk of Henderson was justified.

Affirmed.

WE CONCUR:

_____

_____
Trickey, J

_____
Spearman, C.J.

---

[38] State v. Glossbrener, 146 Wn.2d 670, 679, 49 P.3d 128 (2002).