IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33417-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOSUE CRUZ MEDINA, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, A.C.J. — Josue Medina appeals his conviction for first

degree unlawful possession of a firearm. He argues the trial court erred when it denied

his motion to suppress. He also argues the trial court misunderstood his offender score

when it imposed a high end standard range sentence, and that it erred when it failed to

strike a paragraph in the judgment and sentence that requires him to pay costs of medical

care while incarcerated. We hold that the trial court properly denied Mr. Medina's

motion to suppress and that it did not misunderstand his offender score when it imposed a

high end sentence, but that remand is warranted so the trial court may consider whether it

intended to strike the costs of medical care paragraph and, if so, to correct this oversight.

FACTS

In March 2014, Sunnyside Police Officer Darren Scott responded to a 911 call outside Outlook, Washington. When Officer Scott arrived at the caller's location, the caller, Gabriela Sanchez, reported that an unknown man had asked her for gas for his disabled truck parked in front of her house. Ms. Sanchez said the man appeared to be on drugs and that she was afraid of what he might do. Ms. Sanchez said her husband brought some gas to the man's truck, and she observed the man remove what appeared to be a gun from his truck and place it either inside his pants or inside his shirt. She said the man was unable to start the truck, so he unloaded a green all-terrain vehicle (ATV) from the truck bed, loaded the ATV with items from the truck bed, and then drove away.

Officer Scott noticed that the truck's ignition was broken, and the license plate tabs were expired. He ran a check of the license and registration, and both were expired. Additionally, a check of the Department of Licensing (DOL) database revealed the truck had been given new plates, and he noticed the plates on the truck were out of date. These observations led Officer Scott to believe the truck may have been stolen. He attempted to determine through DOL whether the truck was stolen, but was unable to obtain this information until much later.

Ms. Sanchez described the man's appearance to Officer Scott. She described the

2

man as a "Hispanic male about thirty to forty years old" who was "wearing a blue hat, a knit hat, and a blue [Seattle] Seahawk[s] sweater." Report of Proceedings (RP) at 14. Officer Scott checked the registration for the truck, and it showed the truck was registered to a 61-year-old man. This added to his belief that the truck was stolen.

Ms. Sanchez also showed Officer Scott a cell phone picture of the unknown man. The picture was taken from a distance, and the only thing Officer Scott could see was "[the man's] clothing" and "his general build." RP at 14. Officer Scott was unable to discern any detail from the photograph other than a general profile.

After speaking with Ms. Sanchez, Officer Scott recalled that he had passed a green ATV while en route to her home. He drove to where he had earlier seen the green ATV and saw a man sitting on an ATV in front of a house. The man was wearing a blue hat. Officer Scott asked the man whether he needed help with his disabled truck. The man said he did not know what the officer was talking about, that he was not in any truck, and then turned away.

Based on the man's clothing and build, Officer Scott suspected this man was the same person from the cell phone picture Ms. Sanchez had shown him. Officer Scott told the man of his suspicions, but the man continued to deny he was the same person. Officer Scott then asked the man to lift up his shirt so he could see what type of clothing he had

3

underneath. The man began to lift his shirt, but asked if he was required to do so. Officer

Scott said he was not required to, and the man lowered his shirt. However, Officer Scott

was able to view part of a Seattle Seahawks emblem on the man's clothing.

Officer Scott asked the man if he lived at the house he was parked in front of, and

the man said he was just visiting. Two women then came from the house and confirmed

to Officer Scott that they knew the man, but he did not live with them. The two women

identified the man as "Joe" Medina. RP at 23.

Officer Scott described Mr. Medina's behavior as "uncooperative," and that he

appeared "glitchy" or "paranoid." RP at 24. He believed Mr. Medina's behavior was

consistent with amphetamine use. At about this point, Officer Scott called for backup.

Officer Scott observed that the ATV had a broken ignition. He also noticed there

was a "heavy object" in the front pocket of Mr. Medina's sweater. RP at 21. The object

was in an "L shape," leading Officer Scott to believe it was a gun. RP at 21. He told Mr.

Medina that he knew he had a gun in his pocket and not to reach for it. He directed Mr.

Medina to put his hands up on the ATV handlebars and to keep them there. Mr. Medina

did not comply with Officer Scott's repeated instructions to keep his hands on the ATV

handlebars.

Once backup arrived, Officer Scott and four other law enforcement officers frisked

4

Mr. Medina for weapons. The officers located a small handgun in the front pocket of Mr. Medina's Seattle Seahawks sweater. The officers then ran a background check on Mr. Medina, and it revealed he had prior felony convictions, so he was not permitted to possess the gun they found on him. The officers arrested Mr. Medina and the State charged him with first degree unlawful possession of a firearm.

Prior to trial, Mr. Medina moved to suppress the evidence of the gun. After a testimonial hearing, the trial court denied Mr. Medina's suppression motion, and later entered detailed findings of fact and conclusions of law. Mr. Medina agreed to a stipulated facts trial, after which the trial court convicted him of the charged crime.

The case was set for a sentencing hearing. At the hearing, the proposed judgment and sentence was handed to the trial court. The proposed judgment and sentence listed Mr. Medina's offender as 9+. After discussions with the attorneys and Mr. Medina, the trial court imposed a high end standard range sentence. The trial court found that Mr. Medina was unable to pay legal financial obligations (LFOs) and waived discretionary LFOs, except it did not strike a paragraph requiring Mr. Medina to pay medical costs incurred during incarceration. Mr. Medina filed a timely appeal.

ANALYSIS

A.    MOTION TO SUPPRESS

Mr. Medina argues the trial court erred when it denied his motion to suppress. He does not assign error to any of the trial court's findings of fact. We, therefore, review the trial court's order de novo to determine whether the trial court's unchallenged findings support its legal conclusions. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

Warrantless seizures are generally presumed to be unconstitutional. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008); *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996)); *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). A seizure, for Fourth Amendment purposes, occurs "'when the individual's freedom of movement is restrained by a show of force or authority, such that "in view of all of the circumstances . . . a reasonable person would have believed that he was not free to leave."'" *State v. Sweet*, 44 Wn. App. 226, 230, 721 P.2d 560 (1986) (quoting *State v. Friederick*, 34 Wn. App. 537, 541, 663 P.2d 122 (1983)). The rule against warrantless seizures is subject to "'a few jealously and carefully drawn exceptions.'" *Gatewood*, 163 Wn.2d at 539; *accord Coolidge*, 403 U.S. at 455. The burden is on the State to prove that an exception to the warrant requirement applies. *Hendrickson*, 129 Wn.2d at 71; *State v.*

6

*Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980); *see also Coolidge*, 403 U.S. at 455

("'[T]he burden is on those seeking the exemption to show the need for it.'") (quoting

*United States v. Jeffers*, 342 U.S. 48, 51, 72 S. Ct. 93, 96 L. Ed 59 (1951)).

One such exception is a *Terry*[1] stop. *Ladson*, 138 Wn.2d at 349. A *Terry* stop

allows an officer to conduct a limited pat-down search of the outer clothing of a person in

an attempt to discover weapons that could cause harm. *State v. Russell*, 180 Wn.2d 860,

867, 330 P.3d 151 (2014). A protective frisk is justified "'when an officer can point to

"specific and articulable facts" which create an objectively reasonable belief that a

suspect is "armed and presently dangerous."'" *Id.* (quoting *State v. Collins*, 121 Wn.2d

168, 173, 847 P.2d 919 (1993)). "For example, if an officer has information that an

individual could have a gun, that information, 'when combined with other circumstances

that contribute to a reasonable safety concern, . . . could lead a reasonably careful officer

to believe that a protective frisk should be conducted to protect his or her own safety and

the safety of others.'" *Id.* (quoting *Collins*, 121 Wn.2d at 177). A court should be

reluctant to substitute its own judgment for that of police officers in the field. *Id.* at 867-

68 (quoting *State v. Belieu*, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989)). "'A founded

suspicion is all that is necessary, some basis from which the court can determine that the

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

detention was not arbitrary or harassing.'" *Belieu*, 112 Wn.2d at 601-02 (emphasis omitted) (quoting *Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir. 1966)).

When reviewing a *Terry* stop, a court must examine the totality of the circumstances presented to the investigating officers. *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991). "The totality of circumstances includes the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty." *State v. Fuentes*, 183 Wn.2d 149, 158, 352 P.3d 152 (2015) (citing *State v. Acrey*, 148 Wn.2d 738, 746-47, 64 P.3d 594 (2003)).

Here, Officer Scott responded to a 911 call from Ms. Sanchez, who described an unknown man who was armed and appeared to be on drugs. Ms. Sanchez indicated she was afraid of what the man might do. Mr. Medina was wearing the same clothing that Ms. Sanchez had described, and the same clothing Officer Scott had observed in the cell phone picture taken by Ms. Sanchez. Officer Scott also noticed there was a "heavy object" in the front pocket of Mr. Medina's sweater. RP at 21. The object was in an "L shape," leading Officer Scott to believe it was a gun. RP at 21. Officer Scott has 24 years of experience as a law enforcement officer. Mr. Medina was evasive, uncooperative, and refused to answer questions. Officer Scott testified to the following:

8

[OFFICER] SCOTT: One, well besides not answering any of my questions, I basically told him okay I know you have a gun on you, do not reach for it at all, do not put your hands near your pockets whatsoever, or I'll, you could be shot in my self-defense. And to put [your] hands up on the handle bars and not remove them.

[STATE]: And did he do that?

[OFFICER] SCOTT: He started to, then he kind of took them down, eventually he did but he kept taking them off.

[STATE]: And what did you have to tell him?

[OFFICER] SCOTT: I kept having to tell him to keep his hands on the handle bars.

[STATE]: Okay. He had described, you say you had twenty three twenty four years in law enforcement, describe this situation and why you felt it necessary to do this type of safety frisk in this situation.

[OFFICER] SCOTT: *Well during my ten years of* [sic] *police officer I* [sic] *dealt with many situations. I could probably count on my hand the number of times that I ever actually thought I was going to have to discharge my weapon, and this was one of them.*

[STATE]: Why is that?

[OFFICER] SCOTT: *Because he had immediate access to the fire arm and he was acting in a way he was not cooperating. He was being argumentative with me, and all he had, all that person had to do was reach down.*

[STATE]: How far away from him were you at the time?

. . . .

[OFFICER] SCOTT: Five feet.

[STATE]: . . . [D]id you feel at that point you could [frisk him without officer assistance]?

[OFFICER] SCOTT: *Well I chose to wait for backup in case he did choose to fight. I was trying to do it the safest way I could think of. If he were to try to fight, who knows what would have happened. I figure if I had more officers there it would de-escalate the situation to a point where no one was going to get hurt.*

RP at 28-29 (emphasis added).

9

Mr. Medina argues Officer Scott never had reasonable suspicion that a crime had taken place. We disagree. Officer Scott had a reasonable suspicion that the disabled truck and green ATV were stolen, and that Mr. Medina had driven both and Mr. Medina was lying when he denied he knew anything of the truck. Given the need to investigate whether the truck and the green ATV were stolen, and given Officer Scott's objectively reasonable safety concerns, he and his fellow officers were justified in frisking Mr. Medina for weapons. We conclude that the trial court properly denied Mr. Medina's motion to suppress.

B.    OFFENDER SCORE CALCULATION

Mr. Medina argues the trial court imposed a high end standard range sentence because it thought his offender score was 14. Calculation of a defendant's offender score is reviewed de novo. *State v. Mutch*, 171 Wn.2d 646, 653, 254 P.3d 803 (2011); *State v. Parker*, 132 Wn.2d 182, 189, 937 P.2d 575 (1997). An incorrect sentence may be challenged for the first time on appeal. *State v. Nitsch*, 100 Wn. App. 512, 519, 997 P.2d 1000 (2000). A sentencing court acts without statutory authority when it imposes a sentence based on a miscalculated offender score. *In re Pers. Restraint of Johnson*, 131 Wn.2d 558, 568, 933 P.2d 1019 (1997).

An offender score establishes the standard range term of confinement for a felony

offense. RCW 9.94A.530(1); RCW 9.94A.525. The sentencing court calculates an

offender score by adding current offenses, prior convictions, and juvenile adjudications.

RCW 9.94A.030(11); RCW 9.94A.589(1)(a). "A defendant's current offenses must be

counted separately in determining the offender score unless the trial court finds that some

or all of the current offenses 'encompass the same criminal conduct.'" *State v. Anderson*,

92 Wn. App. 54, 61, 960 P.2d 975 (1998) (quoting former RCW 9.94A.400(1)(a) (1998)).

For nonviolent offenses, the offender score is generally calculated by counting "one point

for each adult prior felony conviction and one point for each juvenile prior violent felony

conviction and 1/2 point for each juvenile prior nonviolent felony conviction." RCW

9.94A.525(7). "A correct offender score must be calculated before a presumptive or

exceptional sentence is imposed." *State v. Tili*, 148 Wn.2d 350, 358, 60 P.3d 1192

(2003). "Remand is necessary when the offender score has been miscalculated unless the

record makes clear that the trial court would impose the same sentence." *Id.*

Here, the judgment and sentence lists Mr. Medina's offender score as "9+."

Clerk's Papers at 74. Nowhere in the judgment and sentence or during sentencing was

the trial court told Mr. Medina had an offender score of 14. Instead, at sentencing the

State accurately noted that Mr. Medina had 14 prior felonies. The prior felonies listed on

the judgment and sentence show 5 adult felony convictions and 9 juvenile nonviolent

11

felony convictions. In addition, the judgment and sentence lists 2 current felony convictions. Mr. Medina's offender score was properly calculated as 9+.

Prior to imposing sentence, the trial court reviewed with Mr. Medina his extensive criminal history, which also included 34 misdemeanors and a prior dismissed charge for unlawful possession of a firearm. The trial court imposed a high end standard range sentence not because it misunderstood Mr. Medina's offender score, but because of Mr. Medina's extensive criminal history and extensive warnings—repeated by a judge 14 times—that he could not possess a firearm.

Moreover, the particular facts of this case justify a high end sentence: Not only did Mr. Medina unlawfully possess a firearm, he repeatedly ignored Officer Scott's instructions to keep his hands on the ATV handlebars. This incident could have escalated and led to the death of a veteran police officer. We conclude that the trial court did not misunderstand or err when it imposed a high end standard range sentence.

C.    IMPOSITION OF COST OF MEDICAL CARE

The trial court found that Mr. Medina lacked the present or future ability to pay his LFOs, and struck discretionary LFOs. Mr. Medina argues the trial court erred when it failed to strike paragraph 4D5 in the judgment and sentence, the paragraph that requires him to pay medical costs incurred during incarceration.

12

No. 33417-1-III
*State v. Medina*

Our review of the sentencing colloquy convinces us the trial court intended to strike the paragraph but failed to do so. If so, this is a scrivener's error that the trial court is authorized to correct. CrR 7.8(a). We therefore remand this issue to the trial court for it to determine whether it intended to strike this paragraph. *See State v. Munoz-Rivera*, 190 Wn. App. 870, 895, 361 P.3d 182 (2015) (the remedy for scrivener's error is remand to the trial court for correction). Unless ordered by the trial court, this may be done without Mr. Medina being present.

Affirmed, but remanded to consider possible scrivener's error.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____          _____
Siddoway, J.                                                    Pennell, J.

13